**STATE ex rel. BOYKIN v. HOPE PRO-
DUCING CO.***

No. 5255.

Court of Appeal of Louisiana.
Second Circuit.

April 30, 1936.

G. P. Bullis, of Vidalia, for appellant.

Shotwell & Brown, of Monroe, for appellee.

TALIAFERRO, Judge.

Plaintiff executed to the Standard Oil Company of Louisiana an oil and gas lease on the S. ½ of N. W. ¼ of section 21, township 17 north, range 6 east, in Ouachita parish, wherein appears the following covenant designed to govern the respective rights and obligations of the parties in the event gas in paying quantities was produced from the land, while the lease was in effect:

"To pay the lessor $200.00 each year for each well producing gas only, until such time as the gas shall be utilized or sold off the premises, and at that time the royalty above named shall cease, and thereafter the grantor shall be paid one-eighth

*Rehearing denied June 2, 1936.

of the value of such gas calculated at the rate of not less than 3 cents per thousand cubic feet, corrected to two pounds above atmospheric pressure, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense."

The Standard Oil Company assigned its rights under the lease to the Hope Producing Company, defendant herein, which company, according to the allegations of the petition, brought in a producing gas well on the land in the year 1929. For the period covered by the years 1930, 1931, 1932, to May 1, 1933, it is admitted that 80,913,000 cubic feet of "wet" gas flowed from the well and were utilized. This quantity of the gas, corrected to two pounds above atmospheric pressure, is reduced to 74,132,000 cubic feet, and this reduced volume formed the basis, in the aggregate, on which plaintiff was paid royalty. He received from defendant at regular intervals one-eighth of 3 cents per thousand cubic feet for the gas, a total of $278.00, less a deduction of $20.23, one-eighth of the amount of severance tax due the state. So far as revealed from the petition, he accepted these payments, with deductions for the severance tax, without protest for the long period named and, inferentially at least, acquiesced in defendant's interpretation of the lease covenant and their respective rights thereunder. However, becoming dissatisfied with this interpretation of his rights and believing himself entitled to greater benefits under the lease, and not responsible for any part of the severance tax on the gas, in January, 1935, he instituted this suit, a mandamus proceeding, under Act No. 64 of 1934, to compel defendant to pay to him $483.55, made up of the following items, accurately analyzed and described in defendant's brief:

"1. $20.23, representing one-eighth of the severance tax upon the gas produced from said well, which plaintiff avers was illegally deducted by defendant;

"2. $185.32, representing an additional royalty of 2 cents per thousand cubic feet as royalty on gasoline produced from said gas; and

"3. $278.00, representing an additional royalty of one-eighth of 3 cents per thousand cubic feet on the gas produced by defendant on the theory that the market value of said gas without its gasoline content was 6 cents per thousand cubic feet and not 3 cents per thousand cubic feet, the basis upon which defendant had computed and paid royalty."

Exceptions of no cause and no right of action filed by defendant being sustained and the suit dismissed, plaintiff prosecutes this appeal.

As relates to the right to charge plaintiff with one-eighth of the severance tax, the exceptions are based upon constitutional and legislative provisions pertinent to that question. Section 21 of article 10 of the Constitution, so far as is needful to this discussion, reads as follows:

"Taxes may be levied on natural resources severed from the soil or water, to be paid proportionately by the owners thereof at the time of severance."

Section 6 of Act No. 140 of 1922 provides that, except as otherwise appears in the act, the quarterly reports to the supervisor of public accounts, necessary to determine the amount of taxes due by those engaged in severing natural resources from the soil or water, and the payment of the taxes thereunder, "shall be by those actually engaged in the operation of severing, whether it be the owner of the soil" or not. This section requires the reporting taxpayer to collect or withhold out of the value of products severed the proportionate parts of the total tax due by the various owners of natural resources when so severed. Section 7 of the act specifically authorizes, empowers, and requires those persons actually engaged in the severance of natural resources from soil or water, "under contracts or agreements requiring payment direct to the owners of any royalty interest, excess royalty, or working interest, either in *money or in kind,*" to deduct from any amount due (the lessors or their assigns) the amount of the tax therein levied, before making such royalty payments.

The above-quoted stipulation of the lease does not give to the lessor the right to claim and receive one-eighth of the gas produced, as is stipulated in his favor in case of oil being produced under the lease, but simply says he "shall be paid one-eighth of the value of such gas," etc. Plaintiff, therefore, strenuously and earnestly contends and argues that even when and after the gas is brought to the surface, he had no proprietory interest there-

in; that in its entirety it belonged to defendant, with the obligation on it to pay as royalty to him the amount stipulated in the lease. He relies on articles 488 and 489 of the Civil Code, under the title "Of Ownership," which are:

"*Ownership Defined.*—Ownership is the right by which a thing belongs to some one in particular, to the exclusion of all other persons."

"*Vested Ownership.*—The ownership of a thing is vested in him who has the immediate dominion of it, and not in him who has a mere beneficiary right in it."

And argues that as he at no time had the control of or dominion over the gas after being reduced to possession by severance, and had no right to exercise such elemental prerogatives of ownership, lack of ownership in him was clearly obvious and certain.

■ In opposition to this position, defendant plants itself upon the doctrine, well recognized by our courts, that a gas and/or oil lease, such as we are considering, only confers upon the lessee the right and privilege of exploring the land therefor, and that ownership in the resource produced thereunder vests in the proportion stipulated in the lease, that is, that the proportionate ownership is determined by the fractional parts of the resource, or its value, to which the parties are entitled.

■ If the constitutional provision quoted above stood alone, plaintiff's position would be more forceful than it is. That provision succinctly accords to the lawmaking branch of the state the right to levy taxes, not against those severing natural resources from the soil or water, but against such resources themselves, and fastens the responsibility for payment of the tax against the owners of the resources, at the time of severance. It was necessary for the Legislature to pass appropriate legislation to carry out this organic permit and provide for the administrative machinery to do so. This was done when the 1922 act was adopted. That act was in effect when the contract before us was executed and, in so far as not expressly negatived by the contract's terms, its provisions are an integral part thereof. No fault could be found with a stipulation in a lease of this character providing that the lessee should pay all the severance tax due the state, which would give to the lessor his entire royalty payments, free of such deduction; but no such covenant is found in the lease and, this being true, the rights and obligations of the parties, not clearly defined in this agreement, are controlled by the act. This act plainly provides that when the lease contract or agreement requires "payment direct to the owners of any royalty interest * * * either in money or in kind," the producer is not only authorized, but required to deduct from such royalty payment the amount of severance tax due thereon, based upon the contract stipulations, and this, too, before making payment to the lessor or other person or persons entitled to receive such payments. If it had been contemplated by the lawmakers that under a contract of this character the producer should personally be responsible for and pay all the tax, that is, that it would be a direct obligation of his, then certainly he would not have been given the right to deduct any part thereof from payments due the lessor for royalty. The inescapable fact is that the plaintiff's right to receive royalty payments is primarily based upon his ownership of the leased land. The measure of such payments is fixed by his contract, and the Legislature has virtually said that, notwithstanding implications in the contract tending to the contrary, he is responsible for the same proportion of the severance tax as he is due to receive from the value of the gas as and when reduced to ownership and possession by severance from the soil.

Plaintiff's energetic counsel does not ignore the decision of the Supreme Court in Sartor v. United Carbon Company, 183 La. 287, 163 So. 103, but urges us to disregard it and pass upon the question here discussed as one of first impression, taking the position that this one case is not sufficient to establish stare decisis of this legal point. This case deals with the identical question we are now passing on. The lease provision is the same, word for word, as that in the lease before us. The court held:

"Under oil and gas lease providing that lessors should be paid one-eighth of value of gas produced calculated at market price, lessee properly deducted proportionate share of severance tax due by assignors of lease before paying royalties (Act No. 140 of 1922, §§ 6, 7, 11, 14)."

■ It is true, as contended, that one decision upholding or rejecting a legal prop-

osition does not amount to stare decisis, especially as regards the court which rendered the decision; but this court, as well as all other inferior courts of the state, feels constrained to follow the Supreme Court's ruling in a given case. And we might add that, as the ruling in the Sartor Case is in complete accord with our own views on the question, we gladly follow it, believing with the utmost confidence that it correctly interprets the contract in the present case and makes proper application of the law pertinent thereto.

As relates to items 2 and 3 sued for, the exceptions are directed against the form of action employed by plaintiff. It is contended by exceptor that as these are unliquidated claims, controversial issues, arising ex contractu, necessarily a long and expensive trial must be had before a judicial determination thereof may be secured; that therefore an ordinary suit, not mandamus, is the appropriate, and only appropriate, remedy available for the purpose. The following excerpt from the brief of defendant's learned counsel clearly reflects the basis of plaintiff's demand and briefly, though correctly, gives unanswerable· reasons for the inapplicability of resort to mandamus to enforce the rights alleged upon:

"The balance of plaintiff's claim is predicated upon an unliquidated monetary demand for additional royalty on natural gas, upon the averment that the payment by defendant to plaintiff of a royalty of one-eighth of 3 cents per thousand cubic feet for the gas produced from plaintiff's land did not represent the market value of the gas, the market value thereof being 8 cents, 2 cents of which was because of the gasoline content of the gas, and only 3 cents of which was additional value of the dry gas after the extraction of the gasoline therefrom.

"Clearly, if plaintiff has a cause of action against defendant for any increased royalties, he has an adequate remedy at law in the form of a direct action against defendant for a monetary judgment for such additional royalties as defendant might owe him under the contract of lease existing between the two parties. Certainly, the law does not authorize plaintiff to institute a mandamus proceeding nor obtain a mandate ordering defendant to pay plaintiff a sum of money under a claim arising ex contractu, particularly where such liability is denied by defendant, and the question of such liability and the amount thereof, if any, involves the interpretation of a contract, the determination of the market value

of the gas, and many other facts which can only be determined after the taking of considerable testimony and the trial of a thoroughly litigated suit. (State v. Acme Lumber Company, 115 La. 893, 40 So. 301)."

█ It is not debatable that unless the 1934 act sustains the form of action herein, it must fall. Mandamus is an extraordinary remedy and resort to it to collect or enforce unliquidated obligations was never intended nor admitted. It is admitted when there is no adequate remedy at law and where the issue is free from doubt. State v. Acme Lumber Company, 115 La. 893, 40 So. 301.

It may be invoked to force performance of ministerial duties, to prevent a denial of justice, or the consequence of defective police, "and where justice and reason require that some mode should exist of redressing a wrong, or an abuse of any nature." Code Prac. art. 830. Corporations may be compelled thereby to perform the duties required by their charters and to receive and recognize and restore, if improperly ousted, those officers who have been legally chosen to administer its affairs. Code Prac. art. 834. It is not admitted, as was attempted in the Acme Lumber Company Case, supra, to enforce a claim for damages based upon a bond, even though such a demand be coupled with another to enforce which a mandamus may properly be availed of.

█ As plaintiff's suit must stand or fall upon Act No. 64 of 1934, we shall now undertake a discussion of its provisions. At the outset, we will say that any law designed to transform the functions of the writ of mandamus into an agency for the enforcement of disputed rights and obligations, for the solution of which necessarily there must be a trial, as in ordinary cases, should be free of doubt of such purpose and be so clear that judicial interpretation would be unnecessary to ascertain its meaning. Such a law would be an innovation in the legal history of the state and a potential instrument of far-reaching mischief. We are quite clear in the opinion that the act was not intended to be used, nor can it be so used, as plaintiff has attempted in this case.

The first section of the act reads as follows:

"Be it enacted. by the Legislature of Louisiana, That it shall be unlawful for any person, firm or corporation, or the agent, employee· or officer of any such persons, firm or corporation, when

"1. such person, firm or corporation has leased any real property, or has acquired the mineral rights therein by lease or otherwise, *from the last record owner thereof, as of the date of such lease and under whom said lessee or producer claims,* holding under any instrument sufficient in terms to transfer title to such property or said mineral rights, for the purpose of developing the same for oil, gas or other minerals; or

"2. is holding any such lease under any assignment thereof; or

"3. Is producing for his or its account, or is producing and selling to others, any such oil, gas or other minerals under such lease or under any assignment thereof; or

"4. Has purchased from any such lessor, or any person holding under such lessor, or from the lessee or any person holding under such lessee, any oil, gas or other minerals produced from said leased property, to withhold payment from the lessor or lessee, or any person holding from either or both of them, of any rentals, royalties or other sums whatever, including the purchase price of any such oil, gas or other minerals, due by virtue of such lease to any such lessor or lessee or person holding from either or both of them."

Section 2, so far as needful to this discussion, is as follows:

· "That any person, firm or corporation that has actually drilled or opened on any land in this State, *under a mineral lease granted by the last record owner,* as aforesaid, of such land or of the minerals therein or thereunder if the mineral rights in and to said land have been alienated, who holds under an instrument sufficient in terms to transfer the title to such real property, any well or mine producing oil, gas other minerals shall be presumed to be holding under lease from the true owner of such land or mineral rights and the lessor, royalty owner, lessee or producer, or persons holding from them, shall be entitled to all oil, gas or other minerals so produced, or to the revenues or proceeds derived therefrom, unless and until a suit testing the title of the land or mineral rights embraced in said lease is filed in the district court of the parish wherein is located said real property. A duly recorded mineral lease *from such last record owner* shall be full and sufficient authority for any purchaser of oil, gas or other minerals produced by the well or mine aforesaid to make payment of the price of said products to any party in interest under said mineral lease, in the absence of the aforementioned suit to test

title or of receipt, by such purchaser, of due notification by registered mail of its filing, and any payment so made shall fully protect. the purchaser making the same; and so far as said purchaser is concerned as against all other parties, the producer of such oil, gas or other minerals shall be conclusively presumed to be the true and lawful owner thereof."

Section 4 is as follows:

"That a writ of mandamus to compel payment of whatever may be due to any party in interest under the circumstances hereinabove set out, or under any division order, may be issued by any court of competent jurisdiction against any person, firm or corporation liable for the payment claimed; and the proceedings shall be tried by preference."

We experience little difficulty in determining the legislative intent in adopting this act. It supplied a long-felt need, and in its operative effect will serve to prevent imposition upon and unjust discrimination against those whom it was intended to protect. The act establishes a rule of conduct for the protection of lessors, and their assigns, under oil and gas leases, and also a rule of security and safety for lessees and those holding under or purchasing from them. The right to resort to mandamus to compel payment of rentals, royalties, or other sums due under the specific terms of the lease, is limited to demands which embrace an amount or amounts definitely fixed in the contract, in the present case to one-eighth of 3 cents per thousand cubic feet of gas produced from the well, and as this amount has been regularly paid to plaintiff, no demand is made therefor. This was the minimum he was to have received under the lease. If the value of the gas exceeded this minimum rate, he is entitled to recover the difference, but in an ordinary action.

The act was designed also to protect those persons whose rights arose from or are based upon contracts with the last record owner of the lands covered thereby, and to those who deal with or acquire from such persons. The last record owner is given the status of true owner, as related to all of said persons, and this status continues as to them until disturbed by filing of suit by an adverse claimant of the leased land or some real right concerning it. Under the act, royalty payments, definitely fixed in the lease, may not be legally withheld from those persons entitled to receive same, because of any defect in the title of the leased property or because of any threat or pur-

pose on the part of third persons to involve the title or lease itself in litigation. Actual filing of suit by such third persons is necessary to stop the operative effect of the terms of the act.

We are of the opinion that the exceptions were properly sustained, in so far as the demand for return of the deducted severance tax is concerned. As regards the demand for amounts set forth in items 2 and 3, the exception of no cause of action was properly sustained; but as to these items the exception of no right of action was erroneously sustained. So far as these two items are concerned, this judgment will leave open to plaintiff the right to again sue for them by appropriate action; the merit or lack of merit therein not being affected hereby.

For the reasons herein assigned, the judgment appealed from is reversed and set aside, in so far as the exception of no right of action was sustained as to items 2 and 3, and in all other respects, said judgment is affirmed with costs.