173 So. 103

## SARTOR et al. v. UNITED GAS PUBLIC SERVICE CO.

No. 34131.

Feb. 1, 1937.

Rehearing Denied March 1, 1937.

G. P. Bullis, of Vidalia, for appellants.

Wilkinson, Lewis & Wilkinson, of Shreveport, and Sholars & Gunby, of Monroe, for appellee.

Hugh M. Wilkinson, of New Orleans, amicus curiæ on behalf of Richland Parish Royalty Owners Protective Ass'n.

Garland & Johnston, of Shreveport, amici curiæ.

ODOM, Justice.

By contract dated November 30, 1928, plaintiffs granted to O. E. Hodge the exclusive right to explore forty acres of their land for oil, gas, and other minerals.

Hodge assigned the contract to the Louisiana Gas & Fuel Company, a corporation, which drilled one gas-producing well. The contract and the well finally passed into the hands of the United Gas Public Service Company, the defendant in this case.

The gas royalty clause in the contract reads as follows:

"To pay the Lessor two hundred dollars each year for each well producing gas only, until such time as the gas shall be utilized or sold off the premises, and at that time the royalty above named shall cease, and thereafter the grantor shall be paid one-eighth (⅛) of the value of such gas calculated at the rate of not less than three cents per thousand cubic feet, corrected to two pounds above atmospheric pressure."

During the years 1930, 1931, and 1932 the defendant corporation took from the well 477,873,000 cubic feet of gas and paid to the plaintiffs as royalty one-eighth of the value thereof, calculated at 3 cents per thousand cubic feet.

The payments were made in monthly installments, the amount of each payment being one-eighth of the value of the gas taken during the previous month, calculated at 3 cents per thousand cubic feet, less one-eighth of the severance tax. Attached to each of the checks sent to plaintiffs was a statement showing the amount of gas taken, its value at 3 cents per thousand cubic feet, and showing that the entire amount of the severance tax had been paid by defendant and that one-eighth thereof was charged to plaintiffs. These monthly statements were accepted by plaintiffs without complaint.

Plaintiffs brought this suit in May, 1933, alleging that they had accepted these royalty payments on the supposition and belief that the market value of gas in the Richland field, where this gas was produced, was only 3 cents per thousand cubic feet, whereas in fact the market value was 6 cents. In paragraph 8 of their petition they alleged that "defendant and its predecessors took fraudulent advantage of its knowledge and the ignorance of petitioners, to pay them less than the amounts due them."

They asked judgment for the difference between the total amount paid them during those years and the amount which they would have received had the value of the gas been calculated at 6 cents instead of 3 cents.

Plaintiffs further alleged that they owed no part of the severance tax and prayed for judgment ordering defendant to refund the amount, $119.47, charged to them by defendant in the statements.

Defendant pleaded acquiescence and estoppel, grounded upon the proposition that plaintiffs, having accepted payments based upon the value of the gas calculated at 3 cents, and having acquiesced in the charge made against them by defendant for one-eighth of the severance tax due the state, cannot now be heard to say that 3 cents per thousand cubic feet was not the market value of the gas during those years or that the severance tax charge was not correct.

The trial judge heard evidence on this plea and overruled it. Defendant then answered. Its defense, in sum, is that 3 cents per thousand cubic feet was the market value of the gas taken and that plaintiffs were required by law to pay one-eighth of the severance tax.

From a judgment rejecting their demands in toto, plaintiffs appealed.

Under the mineral lease granted by plaintiffs, they were to be paid as royalty one-eighth of the market value of the gas extracted from their land. Three cents per thousand cubic feet was stipulated as the minimum value of the gas, but no maximum value was fixed, and it is conceded by defendant that plaintiffs were entitled to royalty payments based upon the market value.

■ Where there is no stipulation to the contrary in a lease contract of this kind, "market value" is understood to mean the current market price paid for gas at the well or in the field where it is produced. Wall v. United Gas Public Service Company, 178 La. 908, 152 So. 561; Sartor v. United Carbon Company, 183 La. 287, 163 So. 103, 104.

Plaintiffs' land is in what is known as the "Richland field," and in order to prove the "market value" of natural gas in that field they filed in evidence eight documents marked for identification as P–5 to P–13, inclusive. These documents are contracts entered into by large corporations engaged in the business of producing and selling natural gas in the various gas fields of North Louisiana, with pipe-line companies, which are engaged in the transportation to and sale of gas at the town borders of various towns and cities in several states. They all relate to the sale of gas produced in the Richland and Ouachita fields and show the prices paid to producers by the pipe-line companies.

Plaintiffs' Exhibit 5 is a contract between the Industrial Gas Company, a producer, and the Arkansas Louisiana Pipeline Company, a purchaser, and Plaintiffs' Exhibit 8 is an agreement between the Palmer Corporation, a producer, and the Arkansas Louisiana Pipeline Company. The defendant, United Gas Public Service Company, is the successor to and owns all the rights and contracts formerly owned by the Industrial Gas Company and the Palmer Corporation. These two contracts, both made on May 10, 1929, are almost, if not quite, identical in terms and extend over a period of ten years. They show that the prices of gas agreed upon were as follows: For the first three years and four months, 4½ cents; for the next three years and four months, 5½ cents; and for the remainder of the term, 6½ cents.

Plaintiffs' Exhibits 6 and 7 are contracts between the Industrial Gas Company, a producer, and the Dixie Gulf Gas Company, a purchaser, both dated May 10, 1929. They stipulate minimum and maximum prices to be fixed by arbitration within the following limits: From the date of the contract, May 10, 1929, to November 20, 1929, a minimum price of 3 cents and thereafter 4 cents; and a maximum price of 5 cents up to October 31, 1932, and thereafter 6 cents.

Exhibit 9 is a contract between the Industrial Gas Company and the Mississippi Riv-

er Fuel Corporation, and Exhibit 10 is one between the Palmer Corporation and the Mississippi River Fuel Corporation. Each contract is dated August 1, 1929, and runs for a period of fifteen years. The prices fixed in these contracts are 5 cents for the first three years, 6 cents for the next two years, 7.6 cents for the next five years, and 8 cents for the last five years.

Exhibit 11 is a contract between the Industrial Gas Company and the Southern Natural Gas Corporation, and Exhibit 12 is one between the Palmer Corporation and the Southern Natural Gas Corporation. These contracts are dated January 15, 1929, and run for fifteen years. The prices fixed in each are the same, as follows: 4½ cents for the first three years, 6½ cents for the next two years, 8.1 cents for the next five years, and 8½ cents for the remaining five years.

Exhibit 13 is a contract between the Texas-Louisiana Pipeline Corporation and the Louisiana Power & Light Company, in which the producer agrees to sell to the power and light company gas delivered at the corporate limits of certain towns in Richland parish at prices ranging from 10 cents to 25 cents per thousand cubic feet.

Plaintiffs offer no other testimony to sustain their allegations that the market value of gas in the Richland field exceeds 3 cents, the price they were paid by the defendant. These contracts, except Exhibits 6 and 7, show that the minimum price at which the producers agreed to sell gas to the pipe-line companies during the years 1930, 1931, and 1932 exceeded 3 cents. In each of the contracts except two, the prices

agreed upon ranged from 4½ cents for the first three years, to 8½ cents for the last years of the periods over which the contracts run; these periods being ten years in some and fifteen years in other cases.

These contracts show that the pipe lines owned by the purchasers of the gas extend into the fields where the gas is produced and that the producers obligated themselves to deliver the gas into the pipe lines at one specified point in each of the gas fields.

■ It is argued on behalf of the plaintiffs that the prices received by the producers from the pipe-line companies should be accepted as the "market value" of the gas in the field, as that term is used in the lease contract. The trial judge was not impressed with this argument. Neither are we.

The testimony shows that there are two large gas fields in North Louisiana, one known as the "Richland field" and the other as the "Ouachita field." The Richland field comprises an area within the parish of Richland, where the record shows that innumerable oil and gas leases have been granted by landowners. This field has been extensively developed and is, or was at one time, one of the greatest gas-producing areas in the South. Just how many gas-producing wells there are in this field is not shown. The Ouachita field is much larger in area, comprising parts of the parishes of Ouachita, Morehouse, and Union. This field is also highly developed, there being therein literally hundreds of producing wells.

These two fields, comprising parts of the four parishes, Richland, Ouachita, More-

house, and Union, all grouped together in the extreme northern portion of this state, taken together embrace within their limits territory which is said to be one of the largest, if not the largest, natural gas-producing areas of the entire country. For several years there has been produced and is yet being produced in these fields vastly more natural gas than can be disposed of and consumed in local markets, the result being that a market for the gas has been sought in regions far beyond the borders of this state. There is testimony in the record showing that gas from these fields is piped as far north as St. Louis and as far east as Atlanta. Millions of dollars have been spent in the construction of pipe lines to convey the gas to foreign markets. The corporations which built these pipe lines make contracts for the sale of gas to consumers in the territory adjacent to and at the ends of the lines, and in order to comply with their contracts, they in turn contract with producers to furnish the gas delivered into their pipe lines. The contracts between the producers and the pipe-line companies run over periods of ten to fifteen years, the producers being obligated to furnish such amounts of gas as the pipe-line companies may demand, usually within minimum and maximum limits.

In order to supply the gas, the producers must maintain, at enormous expense, what are known as "gathering systems," which involve every expense from the purchasing of the leases to the laying of the lines to convey the gas from the wells to the pipe lines, the cost of meters to be installed at the pipe lines where the gas is delivered, the expense of their installation, the cost of keeping a clerical force to read the meters, calculate the amount of gas delivered, keep books, and make monthly reports to the purchasers.

We have read all the contracts introduced and find that as relates to the obligations assumed by the producers, they are almost identical, about the only difference being as to the minimum and maximum amounts of gas to be delivered. In sum, here is what the producers obligated themselves to do:

First, to deliver a specified "annual minimum" amount of gas to the buyer and be prepared to deliver up to twice this amount upon the demand of the buyer. The annual minimum is subject to upward revisions as specified in the contract, the buyer being at all times entitled to demand a maximum amounting to twice the agreed minimum.

Second, if deliveries for any reason fall below the amount agreed upon, the producer has a specified number of days in which to take steps to correct the deficiency and a specified number of days in which to resume delivery of the full amount. If the deficiency remain uncorrected after the specified number of days, the buyer is not obligated to take the full amount contracted for; and at the expiration of two years, the deficiency persisting, the buyer may cancel the contract.

Third, to deliver all gas to two receiving stations, one in the Ouachita field and one in the Richland field. The producer or seller must provide and maintain meters, pressure gauges, and other equipment for measuring and recording the amount of

gas delivered, and must keep accounts and render monthly statements to the buyer.

Fourth, seller must warrant title to all gas it delivers and must indemnify the buyer in case of judgments arising out of title or royalty litigation. It must pay production and severance taxes.

By thus binding themselves under these contracts, the producers or vendors of the gas take all the risks and assume heavy burdens. They are required to make contracts extending over long periods of time, which involve the hazard or gamble that the wells and the territory then producing gas will continue to produce until the end of the term, which the testimony shows is always uncertain. If the wells for any reason cease to produce, and many wells do, according to the testimony, the producers must drill others. They are required by the pipe-line companies, the purchasers, to deliver during each year a minimum amount of gas, and at the option of the purchasers, double that amount. The producers have no way of knowing what amount of gas the purchasers will demand above the minimum stipulated in the contract, and for that reason it is necessary for them to stand ready at all times to deliver not only the minimum, but the maximum if called upon to do so.

There is a wide range or margin between the minimum and the maximum amounts stated in the contracts. So that the producers, in order to be able during the life of the contracts to comply with their obligations to supply the maximum if the demand is made upon them, are compelled, in effect, to hold in reserve vast quantities

of gas which may never be demanded. By that we mean that it is necessary for the producers to be prepared to deliver, not only the amount of gas which the purchasers are required under the contracts to take, but such additional amount up to the maximum as the purchasers may at their option demand. They must make preparations to deliver gas which may never be called for.

The drastic "stand-by" requirement in these contracts adds greatly to the expense of carrying them out. The testimony shows that the guaranty on the part of the producers to deliver, on demand, large quantities of gas above the minimum, formed part of the consideration for the prices paid by the pipe-line companies.

We have said that the pipe lines extended into the Richland field. By that we do not mean that they were laid up to or even near to each of the wells in the field. The so-called "field" extends over a wide area with wells in every part of it. The pipe lines extend to a point in or near each of the fields where there are installed receiving or delivery stations. The purchasers pay for no gas except that which is delivered.

These plaintiffs assumed no responsibility, guaranteed nothing, took no risks, and shared none of the expense of gathering and delivering the gas to the purchasers.

Plaintiffs' theory that these pipe-line prices should be accepted as the basis for settlement with them is unsound. Under their contract they are entitled to payment for their royalty interest in the gas based upon the "market value" at the place where

it is reduced to possession and ownership, where title vests, which is at the well, not at some distant point in the "field" or elsewhere, to which it is transported for sale and delivery to the pipe lines. This was made clear in the case of Wall v. United Gas Public Service Company, supra.

In the case of Sartor v. United Carbon Company, supra, plaintiffs contended that they should be paid according to the market value of the gas in the "parish" and not the value at the well, and after citing the Wall Case we said:

"The obvious reason why the market price at the well or field where the gas is obtained cannot be said to cover the market price in the parish where the gas is produced is because of the transportation charges which would necessarily augment the market price in the parish above the market price at the well or field. The clauses of the lease are clear from ambiguity and doubt and constitute the law between the parties."

The theory that royalty owners should receive settlements based upon pipe-line prices has been rejected by the federal court in two recent cases. Arkansas Natural Gas Company v. Sartor (C.C.A.) 78 F.(2d) 924, 928; Sartor v. United Gas Public Service Co. (C.C.A.) 84 F.(2d) 436, 440.

We quote from the first of these cited cases the following pertinent paragraph:

"In this case the lessors were under no obligation to deliver any gas at all nor to guarantee that the land would produce any definite quantity annually, or over a period of time. In fact, as production was de-clining, they were not in a position to do so. The undisputed testimony supports the conclusion that the guaranty to deliver large amounts of gas formed part of the consideration for the prices paid [by the pipelines], in the contracts that were ad-mitted. There was no possible way in which the jury could determine accurately how much this amounted to and it was not within their province to guess at it."

In the second of the cited cases, refer-ring to the prices paid by the pipe-line com-panies, the court said:

"They are prices paid under long-term contracts, entered into years before, and therefore having a bearing on the issue to be tried not as representing fixed daily market prices, but merely as aiding in ar-riving at a conclusion as to the fair value at the well."

In the case presently under considera-tion, the testimony shows that natural gas has a "market value" at the wells of 3 cents per thousand cubic feet. The defend-ant called numerous witnesses, all engaged in the business of producing and selling natural gas in the Ouachita and Richland fields. These witnesses without exception testified that the market value of gas at the wells in the field was 3 cents. In ad-dition, defendant offered in evidence nu-merous contracts showing the sale of gas in the field at 3 cents. Innumerable lease contracts (said to be about 900; we did not count them) were introduced in evi-dence, practically all of them showing that the lessors were to be paid royalties based upon the value of the gas at 3 cents per thousand cubic feet.

A detailed review of the testimony introduced by defendant to show the market value of the gas at the wells in these fields would serve no useful purpose. It suffices to say that defendant proved conclusively that the market price in these fields does not exceed 3 cents per thousand cubic feet.

As we have already stated, plaintiff offered no testimony as to the value of gas except that stipulated in the so-called pipeline contracts. Having rejected the theory that the prices stated in these contracts should be accepted as a basis for settlements with these royalty owners, we must rely upon the testimony introduced by defendant to show the market value of gas at the wells or in the fields where it is produced.

The other question presented is whether plaintiffs are required under the law to pay any part of the severance tax due the state. We might dispose of this question by stating that we have already decided it in Wright v. Imperial Oil & Gas Products Co., 177 La. 482, 148 So. 685, and Sartor v. United Carbon Co., supra. See, also, State ex rel. Boykin v. Hope Producing Co. (La.App.Second Circuit) 167 So. 506. But counsel for plaintiff and special counsel for certain landowners in the Richland gas field have asked us to give the question further consideration, and because of their most earnest solicitation we have done so.

The gas royalty clause contained in plaintiffs' contract provides that the lessees shall pay to them $200 per year for each well producing gas only until such time as the gas is utilized or sold off the premises, at which time this royalty shall cease and that thereafter they shall be paid "one-eighth of the value of such gas," which means that their royalty interest in the gas was to be one-eighth of its value.

Section 21, article 10 of the Constitution, reads as follows:

"Taxes may be levied on natural resources severed from the soil, or water, to be paid proportionately by the owners thereof at the time of severance."

The theory advanced by counsel is that these lessors were never owners of any part or portion of the gas produced by the well, and for that reason they owe no part of the severance tax.

The above-quoted constitutional provision delegates to the Legislature authority to levy severance taxes on natural resources severed from the soil or water. That authority was exercised by the Legislature by the adoption of Act No. 140 of 1922. Section 1 of that act says that such taxes are "hereby levied" and that "such taxes shall be paid by the owner or proportionately by the owners thereof at the time of the severance."

The act not only levies a severance tax upon all natural resources severed from the soil or water, fixes the amount thereof, and sets up the machinery for its collection and distribution, but contains what was evidently intended to be the Legislature's interpretation of the meaning of the ownership clause in the Constitution. The members of the Legislature were familiar with section 21, article 10 of the

Constitution. That is shown by the fact that the language of the Constitution was repeated almost word for word in section 1 of the act itself. It cannot be said, therefore, that the members of the Legislature overlooked the constitutional provision which counsel say absolves plaintiffs from the payment of any part of the severance tax due the state. And yet they wrote into the act a section which clearly imposes upon the landowners who grant to others the exclusive right to explore their land for oil and gas the duty of paying a proportionate part of the severance tax under royalty clauses like the one found in this contract. We refer to section 7, which reads as follows:

"Every person * * * actually engaged in severing oil, gas, or other natural resources from the soil or water, or actually operating oil or gas property, or other property from which natural resources are severed, *under contracts or agreements requiring payment direct to the owners of any royalty interest, excess royalty, or working interest, either in money or in kind, is hereby authorized, empowered and required to deduct from any amount due, or from anything due, the amount of the tax herein levied before making such payments.*" (Italics ours.)

Under the contract involved in this case defendant, who was engaged in severing gas from plaintiffs' land, was operating under a contract or agreement requiring payment direct to them of a "royalty interest" in money, not "in kind." That royalty interest was one-eighth of the value of the gas, and the act says, in effect,

that it does not matter whether the royalty is to be paid "in money" or "in kind." In either event the one actually engaged in severing the resource from the soil or water is "required" to deduct "from the amount due," that is, the amount due the landowner if the royalty interest is to be paid in money, or "from the thing due" the landowner if the royalty interest is to be paid in kind, "the amount of the tax herein levied before making such payments"; that is, before making payments to the landowners.

The meaning of this section of the act is clear and without the slightest ambiguity. But counsel argue that its provisions are inconsistent with and contrary to the Constitution and section 1 of the act.

The members of the Legislature evidently did not think so. It is reasonable to assume that they did not intend to write into the act two sections in direct conflict with each other, and in our opinion they did not do so.

A reasonable construction of the so-called oil and gas lease contract granted by these landowners is that they intended to reserve and did reserve a "royalty" or "royalty interest" in whatever natural resource might be severed from their soil. Such contracts as this have always been understood to be mining contracts or mining leases. The parties themselves so designated this one, as shown by the provision therein which says that the owners of the land "has (have) granted, demised, leased and let, and by these presents does (do) grant, demise, lease and let unto the said lessee, for the sole and only purpose of

mining and operating for oil and gas" the property described.

As relates to mining, "royalty" or "royalty interest" is "a share of the product or profit reserved by the owner for permitting another to use the property." Webster's New International Dictionary.

In a casenote found in 101 A.L.R. page 885, it is said that the word "royalty" means "the share of the produce or profits paid the owner of the property"; that in cases where oil and gas leases are actually involved it is "universal to refer to the lessor's portion of the oil, or the proceeds thereof, as 'royalty.'"

In this case plaintiffs' "royalty interest" in oil, if discovered, was to be one-eighth of it in kind, and in gas one-eighth of its proceeds. Instead of plaintiffs' royalty interest in the gas being paid in gas, it is payable in money, and the Legislature has said that where there is an "amount," that is, the amount of money due the landowner under the contract, the "amount of tax levied" must be deducted before any payment is made to the lessor.

Plaintiffs' remuneration for the use of their lands for the production of gas is a share of its proceeds. That was their royalty or royalty interest, which royalty, or royalty interest, according to legislative interpretation, is property. We think that interpretation is reasonable under the general principles governing mining contracts. We therefore see no conflict between sections 1 and 7 of the act, and none between section 7 and section 21, article 10 of the Constitution.

The judge thought that plaintiffs were liable for one-eighth of the tax. We think so, too. The judgment under review is affirmed in all parts.

FOURNET, J., concurs in the decree.