PONDER, Justice.
 

 This suit involves a provision in a lease calling for the interpretation of an overriding royalty clause and a unitization and pressure maintenance agreement. The defendant has appealed from a judgment of the lower court decreeing the plaintiff to be Sntitled to an overriding royalty, and ordering an accounting. The plaintiff has answered the appeal asking for the reversal of that portion of the judgment decreeing the oil payment subject to severance taxes.
 

 After listening to the arguments, a careful consideration of the briefs, and a study of the record, we have arrived at the conclusion that the trial judge has correctly disposed of the issues raised in this case. In his written opinion, the trial judge 'has carefully stated the pleadings, the issues and the evidence adduced. His reasons for judgment are ably and correctly stated and we have adopted them as our opinion in this cause, viz.:
 

 “Plaintiffs, the owners of 373.81 acres of land in Claiborne Parish, Louisiana, executed an oil and gas lease thereon to the Midstates Oil Corporation on the 18th- day of May, 1942, and now sue the defendant (1) for $3,531.72 with interest, as the balance due pursuant to the ‘oil payment’ clause provided in the Lease attached to the petition and (2) to have recognized their right to an over-riding royalty on oil of 1/16 of 7/8 of the oil produced from the leased premises, or, in the alternative
 
 *184
 
 that it be decreed that the Provisions of Article IX of the Haynesville Unitization and Pressure Maintenance Agreement had the effect of superseding the provisions of the annexed lease providing for the termination of the overriding royalty; and (3) that the defendant be ordered to file a full and complete account of all oib produced, saved and marketed from the leased premises or production allocated to said lease, and upon such accounting that the plaintiffs have judgment for the amount due under said overriding royalty clause.
 

 “Defendant, for answer to the plaintiffs’ demands admits the execution of the lease and the terms thereof; avers that the ‘oil payment’ provided for in the lease has been fully completed and all oil provided for therein has been delivered to plaintiffs ; denies that the overriding royalty of 1/16 of 7/8 of production ever came into existence because prior to the completion of the ‘oil payment’ and by reason of the Haynesville Unitization and Pressure Maintenance Agreement and order No. 33 A of the Commissioner of Conservation of the State of Louisiana, of date April 24, 1944, the wells on the leased premises were unitized with all other wells in the Haynes-ville Oil Field in the Pettit Zone, and since that time the oil has been produced by mechanical means.
 

 “There is little dispute as to the facts in the case, as practically all of the evidence produced by plaintiffs and defendant came from witnesses for defendant.
 

 “The evidence shows that the wells-drilled on the leased premises were flowing-oil wells and were still flowing oil or capable of flowing oil at the time of the effective date of the Haynesville Unitization; and Pressure Maintenance agreement: which was 7:00 A. M. May 1, 1944; that: ■ thereafter the Operators in the Haynes-ville Oil Field erected a gasoline and hydrocarbon extraction plant; that engines-were installed to compress the gas; that gas so compressed was returned to the pet-tit zone; a water injection plant was also-installed and water forced into the producing zone; that one of the flowing wells'on the leased premises was ‘killed’ and’ used through which gas was injected into-the ground; that two of the wells producing oil on the leased premises were ‘killed’" and thereafter used as water injection, wells through which water under pressure-was forced into the oil bearing strata of’ the field, all of which had the effect of controlling and maintaining the bottom hole-pressure in the field with the view of prolonging the production of oil and the more-efficient recovery of the oil in the ground,, and which was production of oil by artificial means.
 

 “The controversy between the parties-arises out of the following provision in. the lease, which we quote, and which is applicable to both demands contained in-plaintiff’s petition.
 

 “ * * Out of each drilling unit: which shall be so established,
 
 Lessors
 
 re
 
 *186
 

 serve unto themselves l/8th of 7/8ths
 
 of all oil which may be produced, saved and marketed from any well or wells drilled thereon, to be delivered to Lessors free of cost into the pipe line to which said well or wells shall be connected, until such time as there shall have been delivered to Lessors, as hereinafter provided, by reason of this reservation,
 
 oil of the total market value of $150.00 per acre
 
 for each acre of the leased premises included in each particular drilling unit on which oil is being produced, and thereupon
 
 said reservation shall be modified
 
 and become an overriding royalty of 1/16 of 7/8ths of all oil which may be produced; saved and marketed from any well or wells on any such drilling unit, to be delivered to Lessors free of cost into the pipe line to which said well or wells- may be connected, in the same manner as royalty of Lessors in this lease; provided, however,
 
 that said overriding royalty,
 
 as to any particular unit,
 
 shall cease and ipso facto without further act, pass to and become absolutely vested in Lessee zvhen the well or wells, on any such particular unit ceases to flow oil without being pumped or produced by other artificial means.
 
 It is understood that if oil is obtained on one drilling unit, but not on another, the oil payment is limited to $150.-00 per acre for each acre of the leased premises included in the drilling unit on which there is production.
 
 The overriding royalty,
 
 herein provided,
 
 comes into existence as to a particular drilling unit, selected in the manner herein provided, only after the oil payment chargeable to that particular unit has been satisfied, and provided that oil is being produced by naUiral flow, i. e.,
 
 without being pumped or produced by other artificial means. The oil payment from production and the overriding royalty of Lessors shall be computed after deducting oil used by Lessee in the development and operation of said wells, and shall be subject to the same kind of deductions for taxes and other charges as royalty of Lessors under this lease.’ (Emphasis ours.)
 

 “Plaintiffs sue for an amount equivalent to the severance tax deducted from the sale price of l/8th of the 7/8th of the oil produced and delivered into the pipe line for their account under the provisions of the lease quoted above, basing their contention on the proposition that while the severance tax was properly deducted from the sale price of the oil delivered into the pipe line for their account and the net amount paid over to them, that the lessee was obligated to pay plaintiffs out of 1/S of 7/8ths of the oil; that the payments made so far are short of that amount by the amount of the severance taxes deducted from the l/8th of the 7/8th. It is defendant’s contention that the oil payment has been completed in accordance with that provision of the lease quoted above.
 

 “We do not think plaintiffs’ contention on this score is well founded. The answer is to be found in the lease itself. Lessee did not obligate itself to pay plain
 
 *188
 
 tiff any sum of
 
 money
 
 whatever. The lease provides that the lessors reserve unto themselves l/8th of 7/8th of all oil produced ‘* * *
 
 until such time
 
 as there shall have been delivered to lessors * * *
 
 oil of the total market value of $150.00 per acre.
 
 The lessee was not required to deliver to plaintiff l/8th of 7/8ths of the oil ‘until such time as there shall have been delivered to lessor,
 
 oil of the total market value of $150.00 per acre.’
 
 Oil of that value has been delivered in accordance with the lease. Moreover, the lease itself further provides that the ‘oil payment * * * shall be subject to the same kind •of deduction for taxes * * * as royalty of Lessors under the lease.’ The oil delivered belonged to the plaintiffs. It was reserved by them in the lease. They were the owners thereof at the time of .severance and the severance taxes due thereon was due by the plaintiffs. Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103; Constitution of 1921, Art. X, § 21.
 

 “Had the lease provided that the lessee should pay lessors money, or $150.00 per acre, out of T/8 of 7/8ths of production then there may 'have been some foundation for their contention. For the reasons assigned, this portion of the demand is rejected.-
 

 “The oil payment discussed above was not completed until after the leases had been unitized and the pressure maintenance agreement was in effect, and it is defendant’s contention that the overriding royalty never did come into existence because the oil was then being produced by mechanical means. We view the matter in this wise. Plaintiff
 
 reserved
 
 unto themselves l/8th of 7/8ths of the oil produced and saved and this reservation continued in effect, first, as to the whole of the l/8th of 7/8ths until there was produced therefrom oil of the market value of $150.00 per acre, etc., and.thereafter the l/8th of 7/8ths reservation was
 
 reduced
 
 in amount-to 1 /16th of 7/8th and was to continue at the reduced rate ‘provided that oil is being produced by natural flow, etc.’ The reservation of the whole of l/8th of 7/8th was effective regardless of how oil was produced for a limited time, and then the l/8th of 7/8th became l/16th of 7/8th under such conditions. We think that the meaning of this wording is to say that lessors are reserving l/8th of 7/8th of the oil for a time and then l/16th of 7/8th thereafter under the conditions named, and so worded in order to show that the l/8th of 7/8th and the l/16th of 7/8th were not to be in effect at one and the same time. Of course, if at the end of the time for paying the whole of the l/8th of 7/8th and the reservation was being reduced, if it so happened that 'the wells were- not producing oil or that they were not flowing wells at the time; the reservation as reduced royalty would have died aborning. The oil payment was an ‘overriding royalty’ subject t'o reduction arid in
 
 *190
 
 being
 
 reduced
 
 was reduced to l/16th of 7/8th or reduced to zero, depending on the condition then existing. As stated, the terminology used in the lease to the effect that the ‘over-riding royalty’
 
 ‘comes into existence
 
 * * *
 
 only after the oil payment chargeable to that particular drilling unit has been
 
 satisfied/ simply means that both the oil payment and the 1 /16th. of 7/8th were not to be paid at one and the same time — one followed the other. This was a
 
 reservation
 
 of l/8th and then 1/16th under conditions stated and defendant never owned the whole of the 7/8th of the oil from the beginning. It acquired 7/8th less l/8th of 7/8th by the terms of the lease; it acquired another l/16th of 7/8th by completing the oil payment; then it would acquire the additional l/16th when the wells ceased to flow oil. Since plaintiff had the l/8th of 7/8ths we think defendant had to acquire the l/16th of 7/8ths at sometime subsequent to the date of the lease. The only point we are endeavoring to make by the foregoing discussion is whether
 
 plaintiff
 
 was to ‘acquire’ an over-riding royalty of l/16th of 7/8th, or whether
 
 defendant
 
 was to ‘acquire’ from plaintiffs this l/16th of 7/8th under certain contingencies.
 

 “As a preface to a consideration of the lease terms affecting the overriding royalty, we understand the prevailing rule in the oil industry with respect to royalties to be that it is considered that on an average in the production of oil a division on the basis of l/8th of the oil to the land owner and 7/8th to the producer, with the latter paying the expense of production, is a fair division of the oil, hence most leases carry this provision; that in acquiring a lease in undeveloped territory a cash payment of some small amount is paid the land owner for the lease; that under more favorable conditions an additional amount is paid out of the lessee’s 7/8th of the oil called an ‘oil payment’ and under more favorable circumstances a lessor may demand and reserve an overriding royalty, or a specified interest in 7/8th of the production, and, this is usually dependent upon wells producing oil without the necessity of being pumped by the producer, or being required to pay other expense in producing the oil. In other words, if the operator has no other expense in producing the oil than drilling the well and if the well is a large producer he can share a part .of his 7/8th part of the oil with the land owner and still recover his cost and make a profit.
 

 “The lease under consideration shows, that the land owner was paid approximately $125.00 per acre in cash for the lease,, with an additional $150.00 per acre out of 7/8th of the oil, with l/16th of 7/8ths as. an overriding royalty; that six wells, were drilled on the leased premises, all of which were flowing wells; from this and from published accounts, the petit zone of the Haynesville Oil Field is a good oil field;
 
 *192
 
 and was doubtless considered so at the time of the execution of this lease.
 

 “We come to consider the real meaning of the clause:
 

 “ ‘provided, however, that said overriding royalty, as to any particular unit, shall cease and
 
 ipso facto
 
 without further act, pass to and become absolutely vested in Lessee when the well, or wells on any such particular unit ceases to flow oil
 
 without being ptimped or produced by other artificial means’
 

 “In the light of our statement contained in the preface of this phase of the case, we think it was the intention of the parties that the foregoing quoted proviso meant that the overriding royalty should cease when the well or wells ceased ‘to flow oil without (the necessity) of being pumped or (required to be) produced by ■other artificial means.’
 

 “We think that the interpolation of the words within the parenthesis clarifies and expresses the intention of the parties with respect to when the overriding royalty should cease. Defendant’s counsel, at one stage of the proceeding stated that the ■operator would have had the right at any time he saw fit to place the well on a pump or produce the oil by other artificial means and thereby stop the running of the overriding royalty. We do not think so. We think that so long as the well, or wells, are capable of flowing oil,
 
 without the necessity
 
 of pumps or other artificial means, that the plaintiffs would be entitled to an overriding royalty under a lease worded as the lease here in question.
 

 “The evidence shows that the wells on the leased premises were either flowing or capable of flowing on the date the ‘unitization agreement’ went into effect and the re-cycling process was initiated'. The evidence further shows, however, that according to the history of the wells, the deceleration of the bottom hole pressure and the decline in the production of oil from these wells, they would have long since ceased to flow, 'had not the ‘pressure maintenance agreement’ been put into effect, hence, it becomes necessary to consider that agreement and see what effect it had on the ‘overriding royalty’ of plaintiff.
 

 “The Haynesville Oil Field was ascertained to be composed of one common pool of oil underlying several townships of land of which plaintiff owned 373 acres, leased to defendants; that in
 
 competitive operations
 
 many wells were required to be drilled ; much gas was being flared and wasted; the wells would be depleted at an earlier date due to the loss of gas pressure, there fore, the operators conceived the idea of unitizing the field, stop competitive drilling, erect a gasoline plant to process the gas, and remove therefrom its saleable contents, and to inject the residue gas back into the oil producing strata and thereby maintain the bottom hole pressure. In order to perfect this agreement it was necessary to obtain the consent of the royalty
 
 *194
 
 owners, which they did, and without which the operators could never have operated under the agreement for under the agreement it was necessary (as they did) to kill three of the producing wells on plaintiffs’ land and use these for injection wells. This they would not have been permitted to do without the agreement. In order that they might so operate it was agreed that instead of considering the oil actually produced from the respective leased premises, it was agreed and settled that each lease was to have allocated to it a certain percentage of the production of the entire field, whether produced by one lessee or another lessee, so that by virtue of the agreement the respective leases (so far as the production of oil therefrom was concerned) lost their identity and thereafter there was allocated to that lease a percentage of the oil produced in the field as if that amount had, in fact, been produced from the particular lease, even though no production was actually had from that lease during the month.
 

 “The agreement provided that the ‘operators’ were to erect the plant, etc., at their own expense, Art. IX, page 27 and all cost of the development and operations of the Unit Area. In Art. VI it is written:
 

 “ ‘Provided further however, that nothing in this agreement contained shall be construed as imposing upon any Royalty owner the obligation to pay any development and operation expense, except as provided above in ’this Article, * * * with respect to Excess Royalties, * .* * unless by the terms of pre-existing agreements such obligation is imposed upon such Royalty Owners.’
 

 Then we come to Article IX of the agreement and the last paragraph thereof with respect to overriding or ‘excess royalties’ which reads as follows:
 

 “ ‘In respect of .Production Units in the Unit Area affected by royalties or payments in addition to or in excess of the usual one-eighth lease royalty (such additional royalties or payments and such excess royalty over the usual one-eighth lease royalty being herein referred to as Excess Royalties) it is recognized that there may at some time in the future be a time or times when net revenues to the working interest, after provision for such Excess Royalties, will be exceeded by operating expenses, and to eliminate such inequity said Excess Royalties shall either be adjusted by mutual agreement or reduced as hereinafter provided. Therefore, notwithstanding anything anywhere contained in this agreement, or in any lease, assignment or other contract to the contrary, it is agreed that if during any period of ninety consecutive days the net revenues derived from the production allocated to the working interest in any Production Unit or to any part of the working interest in any Production Unit which is subject to any Excess Royalty, after provision for such Excess Royalty, shall be less than the operating expenses payable by the Operator
 
 *196
 
 owning such working interest or part thereof in such Production Unit, then the Operators Committee or the Advisory-Committee shall give prompt written notice, or cause such notice to -he given, of such condition to the parties affected and-such parties shall endeavor by mutual agreement equitably to adjust such Excess Royalty to some mutually satisfactory lesser fraction. In default of consummation of such agreement within fifteen days after the date of the aforesaid note, said Excess Royalty shall ipso facto be and become reduced so that there shall be deducted from each amount which would have been payable thereon except for this provision, a sum equal to the proportionate part of the operating expense payable by the Production Unit' affected which would be payable by an operating or working interest of equal size. Such adjustment or reduction shall be effective -back to the expiration of said period of ninety consecutive days and shall continue in effect during such time or different times, but only during such time or different times, as the operating expense, as aforesaid, exceeds net revenues for any period or periods of ninety consecutive days. No capital expenditure shall be included in determining operating expense. Net revenues and operating expenses shall be as determined from the books and accounts of the unit operation.’
 

 We think it cannot be disputed that oil in the Haynesville Oil Field is now being produced by artificial means, but was it the intention of the parties that excess royalties should cease to exist, or was it the intention of the parties to substitute for the excess royalty provisions in the lease, the quoted provisions of Article IX of the agreement; we think that since the individual leases with respect to the production of oil therefrom have lost their identity, that of necessity the leases lost their identity as excess royalty based on the manner of production of oil from the leased premises, and that the excess royalties were transferred from ‘7/8 of the oil
 
 produced
 
 from the respective drilling units’ to ‘7/8 of the oil
 
 allocated
 
 to this drilling unit’ just the sanie as the l/18th underlying royalty was handled. It would certainly be unfair and unjust to the land owner to say to him that we have drilled your wells and used them for injection wells and since we are producing no oil from your lease, we will pay you no royalty — they didn’t say this; they said we will pay you on the agreed percentage of production in the field just as if the oil was produced from your well. There can be no sound reason why the same procedure should not, and was not, followed with respect to overriding royalties. We think the agreement gives the answer, it does.
 

 “Defendant says, however, that the whole field is being produced by mechanical means and that ended the excess royalty due plaintiffs. We think that if defendant had said to plaintiffs, if you will sign
 
 *198
 
 this instrument, we will put t'he field on a mechanical basis, and that will stop your . overriding royalty, they would have never secured the signatures of these plaintiffs to the agreement.
 

 “They originally agreed to pay the overriding royalty on flowing wells, this on the 'basis that they would be able to recover and make á profit out of 15/16 of 7/8ths, and since plaintiffs’ 'wells might be killed (and they were) there was substituted the agreement in Art. IX, providing under what circumstances, the overriding royalties should cease, i. e. if the expense of operation exceeded the value of the oil allocated to the working interest — and if the parties could not agree on a reduced proportion for a continuance of the overriding royalty (free of cost) the overriding royalty would be required to pay its pro rata part of operating expense, that is become a working interest in the production.
 

 “We do not consider the facts relating to the question that more oil will be produced by means of the ‘pressure maintenance agreement’ than would have been recovered by competitive means as having any bearing on the questions involved here. It was the duty of lessee to use the best means possible to produce all the oil possible to produce for both plaintiff and defendant.
 

 “We are of the opinion that plaintiffs were entitled to the l/16th of 7/8th of the oil produced as an overriding royalty at the end of the oil payment, and how long it would have lasted without the pressure maintenance agreement cannot be known; that of necessity the provision of Article IX of the agreement was inserted to take the place of the agreement as written in the lease, which provision is now the agreement with respect to plaintiffs’ overriding royalty, and they are entitled to recover thereunder.
 

 “Accordingly, plaintiffs are entitled to an accounting as prayed for within sixty days after this judgment becomes final.”
 

 For the reasons assigned, the judgment appealed from is affirmed.