## HEMLER v. UNION PRODUCING CO.
### No. 367.

District Court, W. D. Louisiana,
Monroe Division.

July 10, 1941.

Motion for New Trial Denied Oct. 13, 1941.

---

[1] No opinion for publication.

G. P. Bullis, of Ferriday, La., for plaintiff.

Sholars & Gunby, of Monroe, La., for defendant.

DAWKINS, District Judge.

The bill in this case was filed September 23, 1940, and is for alleged additional royalties upon natural gas and gasoline extracted therefrom. It is alleged that during the years 1929 to 1939, both inclusive, defendant and its predecessor companies had withdrawn from plaintiff's lands in excess of 11,000,000,000 feet of gas, for which they had paid royalties at the rate of three cents per thousand cubic feet; that during the period 1929 to 1931, inclusive, the market price of said gas was five cents per thousand cubic feet, and from 1932 to 1939, it was six cents per thousand cubic feet; and that an average of four-tenths of a gallon of gasoline was extracted from each one thousand cubic feet of gas, which had a market value of five cents per gallon. The demand is for the sum of $30,593.53 as additional royalties on natural gas, and for $15,177.40, the alleged value of plaintiff's one-eighth royalty of the proceeds of the gasoline.

Attached to and made part of the bill are three mineral leases sued upon, whose provisions as to gas are as follows:

"2nd. To pay the Lessor two hundred dollars each year for each well producing gas only, until such time as the gas shall be utilized or sold off the premises, and at that time the royalty above named shall cease, and thereafter the grantor shall be paid one eighth (1/8) of the value of such gas calculated at the rate of market price cents per thousand cubic feet, corrected to two pounds above atmospheric pressure, and Lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense.

"3rd. To pay lessor for gas produced from any oil well and used off the premises or for the manufacture of cashing head gas, Three Hundred & No/100 Dollars ———— for the time during which such gas shall be used, said payment to be made each three months in advance."

In Exhibit "B" the provision is the same as in Exhibit "A", except that the price is fixed "at the rate of three cents per thousand cubic feet", and the lessor was to be paid $50 per year for the time gas from an oil well was "used off the premises for the manufacture of casing head gasoline * * *"; Exhibit "C" is identical in all respects with Exhibit "B" as to the royalties on gas, that is, it is fixed at three cents per thousand cubic feet, but as to gas used off the premises from an oil well for manufacturing casing head gasoline, the lessor was to be paid $100 a year.

The bill further alleges that the gas and gasoline were sold within the Richland (parish) gas field, and the said field covered an area of about nine miles long, north and south, and about six miles wide from east to west. Other pertinent paragraphs are quoted as follows:

"12. It was the intent and meaning of said lease agreement, and contemplated by the parties thereto, that the market price referred to in said lease was the market price in said Richland gas field in which said gas was produced.

"13. The market price of gas was during all of said years, the same at all points in said Richland gas field, and there was not one price at one part of the field and another at another part.

"14. No gas was sold in said Richland field at a price per thousand feet corrected to two pounds above atmospheric pressure, consequently that market price, to which plaintiff is entitled under said lease, cannot be ascertained directly from sales at that pressure.

"15. One thousand cubic feet of gas, computed or corrected to two pounds above atmospheric pressure, contains ten per cent more usable gas, and ten per cent more actual gas, than one thousand cubic feet of gas computed at eight or ten ounces above atmospheric pressure, consequently the value and market price of 1,000 cubic feet of gas, computed at two pounds above atmospheric pressure is ten per cent greater than the value or market price of one thousand cubic feet of gas computed at eight or ten ounces above atmospheric pressure.

"16. Immense quantities of natural gas were sold and delivered within said Richland gas field during the years 1929 to 1939 inclusive, at prices computed or corrected to eight ounces above atmospheric pressure, amply establishing a market price at that pressure for dry gas."

\*    \*    \*    \*    \*    \*

"18. The market price of said gas during said periods, computed or corrected to two pounds above atmospheric pressure, was ten per cent greater than the above prices."

"34. The true meaning and intent of said leases marked Exhibits A, B & C was that plaintiff, as lessor should receive the value or market price of everything produced by wells drilled under said leases, for 1/8 thereof."

The prayer is for judgment in the sum of $45,770.93.

After preliminary proceedings were disposed of, the defendant answered, in substance admitting that the quantity of gas alleged had been produced by defendant and its predecessor companies, but averred that the price paid to complainant of three cents per thousand cubic feet was as much or more than the market price at the well in the field; that from April 1st, 1929, to March 1st, 1930, all gas produced from plaintiff's lands was sold to Magnolia Gas Company at three cents per thousand cubic feet under a division order signed by plaintiff as of that date, which fixed the price at three cents, and that he was paid his one-eighth royalty at that price accordingly; that the Richland field "was of an irregular pear shape extending twelve miles in a north and south direction, and eight and one-half miles east and west," covering an area of approximately 49,532 acres, of 77½ square miles, and that 270 producing gas wells were drilled thereon; that

under the terms of said lease and the settled jurisprudence of the State of Louisiana "complainant was entitled to royalty payments on gas based upon the 'market value' at the place where it is reduced to possession and ownership where title vests, which is at the well, not at some distant point in the field or elsewhere, to which it is transported for sale and delivery to the pipelines". Further, that "periodically, each and every month, through the entire productive life of said leases and of the Richland gas field, statements were prepared by lessees showing the quantity of gas produced from the leased premises during the preceding month, corrected to two pounds above atmospheric pressure as in said leases stipulated", and royalties paid at three cents per thousand cubic feet, which the lessees in good faith believed to be, and the defendant now alleges was "the market price or value of the gas at the well in said field, which statements were forwarded to the lessor accompanied by checks for the amount of royalties shown to be due, tendered in full payment and settlement thereof, and received and accepted accordingly by plaintiff lessor"; that said tender and acceptance over a period of ten years "established a presumption as to the correctness of the amount thereof, and a stated and settled account, which is plead in bar of complainant's recovery herein"; and in the alternative, defendant pleaded this course of dealing as an accord and satisfaction under "repeated decisions of the Louisiana Courts   \*   \*   "; and that the stipulation for two pounds pressure basis had no relation to price "but to measurement of the quantity."

Further, that even if the pipeline prices are considered, which defendant contends should not be done, the net value of the gas at the well, after deducting gathering and transportation costs, never exceeded three cents per thousand cubic feet. Further, that leases "B" and "C" themselves, fixed the price of the gas at three cents per thousand cubic feet. It, therefore, pleaded payment, and alternatively "acquiescence, accord and satisfaction."

The answer also reiterated the defendant's "prior pleas of prescription of three years, and of res adjudicata, and defense that the petition and annexed documents do not state a claim upon which relief can be granted   \*   \*   \*".

It prayed that its pleas and defenses be "sustained and that plaintiff's demands be rejected at his costs."

With the issues thus made up, the defendant, on May 15th, 1941, filed a motion for summary judgment under sub-section (b) of Rule 56 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. Shortly stated, the grounds of the motion are that no substantial issue of fact is disputed and only questions of law are involved for the following reasons:

1. The leases sued upon are attached to the bill of complaint and their terms or provisions must be construed by the court;

2. The quantities of gas produced are admitted;

3. Complainant admits having received three cents per thousand cubic feet at two pounds pressure as provided by the leases;

4. Monthly statements were furnished complainant throughout the life of the leases, showing the price as three cents per thousand cubic feet, corrected to two pounds above atmospheric pressure, together with checks in full settlement, which were accepted and cashed, and which facts are likewise undisputed;

5. (a) That oil and gas leases granted on lands in and adjacent to the Richland gas field, stipulated royalties as follows:

| "No. of Leases | Royalty Prices | Percentage |
|---|---|---|
| 799 | 3¢ MCF or less | 93.34 |
| 57 | Over 3¢ | 6.66 |
| 856 | | 100.00" |

(b) Sales of gas "delivered at the well were made in the Richland field throughout the life thereof at an average price of three cents or less per thousand cubic feet under thirteen contracts of sale", amounting to "a total of 29,341,848,000 MCF."

(c) That defendant and its predecessors had at all times a "standing offer to buy gas delivered at the well at a price of three cents per thousand cubic feet less a 3/4ths cent per MCF charge for compression when, and if compression was required in order to make deliveries of gas into the field gathering system of the defendant, under which offer several purchases of gas were made as shown in lists of contracts set forth in Par. (b) above quoted."

(d) Three cents per thousand cubic feet "was considered by all producers * * * in the Richland gas field at all times during the life of said field to be the market price or value of gas delivered at the well."

Defendant attached to its motion for summary judgment affidavits of R. C. Stokes, R. W. Hair, S. D. Hunter, C. H. McHenry, W. C. Feazel and E. N. Florsheim, with "documents attached thereto", and also a transcript of the testimony of R. H. Hargrove, taken in another case, that there was a market at the well in the field for natural gas and that it had never exceeded three cents per thousand cubic feet during the life of the field.

6. The lease, Exhibit "A", attached to the bill of complaint "was amended by an agreement and division order executed by complainant and the then owner of the lease by which the former agreed to accept and the latter agreed to pay three cents per thousand cubic feet, computed on a pressure basis of two pounds above atmospheric pressure, so long as such gas was delivered under contract between Ouachita Natural Gas Company and Magnolia Gas Company dated March 31st, 1928"; that "1,638,087,000 MCF of gas was produced from said lease, beginning with the first production therefrom on June 23rd, 1929 to March 31st, 1930, when the properties of both buyer and seller under said contract became merged into the same ownership, was delivered thereunder and royalties based upon the price agreed were paid to lessor" as appeared from the affidavit of J. C. Wright, annexed.

7. That notwithstanding defendant's contention that the pipeline prices are irrelevant, defendant showed that approximately 35% of the gas produced by it and its predecessors, who sold to said pipeline companies under long-term contracts, contained onerous stipulations as to minimum and maximum quantities, reservations, warranties, etc., not involved in the documents sued upon which added "considerably to the costs and expenses * * * over and above the market price and value of the gas at the well", as shown by the before-mentioned affidavit of Stokes, and the extract from the testimony of Hargrove;

8. That the "average net delivery prices received by defendant and its predecessors in title from sales of gas delivered in the field at points distant from the wells where

produced, was for the productive life of said field as follows:

| | Cents P. M. C. F. | |
|---|---|---|
| Gross delivery price | | 4.55 |
| Less gathering and delivery costs | 1.16 | |
| Cost of maintaining reserve | 1.09 | 2.25 |
| Net value of gas at well...... | | 2.30" |

9. (1) That the allegations of the bill of complaint read in connection with the attached Exhibits A, B and C, the latter two having a fixed price of three cents per thousand cubic feet, "fail to state a claim upon which relief can be granted, and according to their plain terms do not entitle plaintiff to royalties upon gasoline;"

(2) That the "mutual interpretation of the contract by the parties, acquiescience, presumption and accord and satisfaction * * * based upon undisputed facts * * bar plaintiff's demands * * * for royalties upon the value of gasoline manufactured from gas produced from the lessor's premises";

10. Defendant further pleaded "res adjudicata and as a waiver and abandonment * * * of his right to recover any further or additional royalties under the leases sued on herein upon either gas or gasoline manufactured therefrom", a suit by the plaintiff in the State court for the Parish of Caddo in which a "final judgment therein (was rendered) on October 12, 1932", rejecting said claim as to these identical leases. Defendant attaches photostatic copies of the pleadings and judgment of the said court.

On May 27th, 1941, complainant filed what is styled "Exception and Answer of plaintiff, J. H. Hemler, to Defendant's Motion for Summary Judgment", in which he sought to have said motion dismissed on the following grounds:

(1) That it disclosed "no right or cause for summary judgment, and the law and rules of the court do not permit the filing of such a motion, and said motion is so bulky with irrelevant and ex parte documents as to seriously encumber the record with immaterial documents and plaintiff therefore moves that said motion be denied and stricken from the record."

In the alternative plaintiff answers as follows:

(2) Said motion does not "correctly state the full claims made by plaintiff";

(3) That "all statements of fact and conclusions of law in said motion are erroneous and incorrect * * * and are very largely immaterial to the issues in this case, and plaintiff denies said facts and law";

(4) That plaintiff resided for several years in the State of California and that neither he nor his agents "had any knowledge or means of knowing as to prices at which gas was being sold in the Richland gas field prior to November 1932"; that since that time "the market price for gas in the Richland gas field has been the subject of extensive dispute and litigation, and that no price has been definitely fixed by any court and the matter has been a subject of great uncertainty";

(5) That on June 24th, 1933, complainant filed in the State court (Caddo Parish) a suit (distinct from the one previously filed therein for royalties on gasoline) "setting forth the leases sued on in the case at bar and setting forth that he was entitled to the market price of one-eighth (1/8) of the gas produced under said leases and setting out that the said market price was peculiarly within the knowledge of the defendant * * * and prayed * * * that they furnish him the necessary information to determine what was the market price and expressed his certainty that the market price was far greater than was being paid to him"; that said suit is still pending, and not "until the year 1941 did the defendant even attempt to furnish plaintiff any of the information called for in said suit"; plaintiff has continued to "accept the payments made to him by defendant because he did not know the exact amount due him and said suit was an open assertion and claim that he was entitled to much more than was being paid him";

He attached copy of "said lawsuit" and asked that the "pleas of prescription, estoppel, payment, acquiescence and accord and satisfaction should be over-ruled and denied";

(6) That the lease "called for the value and market price of gas produced"; that none of the gas "stated in plaintiff's complaint was sold at the well, but that all of it was transported to other places and there sold"; that it was the intention of the parties that the "market price should be at places in the field where produced"; that

the contention of the defendant that "if there are no sales of gas at the well where. produced, then the market price * * * was intended and contemplated * * * to be * * * at a fixed price in the field and sales at a few places in the field are obviously wrong"; and plaintiff asserts that "in computing the market price to which plaintiff is entitled under leases sued on, all the sales in the field should be used and taken, since there are no sales at the well where produced".

Plaintiff prayed that the motion for summary judgment be overruled.

Counsel for plaintiff made affidavit to this pleading that "all the allegations of fact therein and all the allegations of fact in the complaint herein recited * * * at the beginning of this suit are true and correct to the best of his information and belief."

Hearing upon the motion for summary judgment was begun on May 27th, 1941, and on the next day, while the same was still in progress, plaintiff filed a "supplemental answer to the motion for summary judgment," which his counsel overlooked signing, although he did sign the affidavit thereto, in which it was said "that he has been attorney for various land owners in the Richland gas field for more than ten years and has conducted many law suits on the subject of market price of gas in that field and has thereby become well acquainted with the facts regarding sales and prices in that field and that all of the foregoing allegations and all facts in the foregoing answer are true and correct."

This pleading again sought to answer the paragraphs of the motion for summary judgment in chronological order and was somewhat longer than the first. It admitted "that the stated allegations of the bill of complaint are correct, and avers that said allegations are true and correct and hereby makes affidavit to the same". Most of the allegations of the first "Exception and Answer" to the motion were reiterated. Plaintiff disputed the defendant's theory of interpretation of the lease contracts. He admitted receiving the monthly statements, but averred that they were "false and untrue and to the best of plaintiff's knowledge and belief were fraudulent, because they recited the market price of gas to be three cents per thousand cubic feet, when at the time defendant and its predecessors were selling gas in the field at very much higher prices, and defendant and its predecessors well knew of said sales and the market price of gas and were aware that plaintiff did not know such prices."

He denied the allegations of fact of this motion "and the annexed affidavits, documents and testimony of Hargrove". He averred that the large list of leases attached as exhibits to the affidavits of defendant's witness Hair, were "irrelevant and immaterial * * * and were only a part of the total leases in the field and only a small percentage * * * were made within the time involved in this suit"; that the statement of leases by Hair is not a true and correct statement of said leases, because it does not show that the lease contracts were sales of servitudes, nor the price paid for said servitudes and "is only a grossly incomplete summary of the documents alleged, and the documents themselves would be the best evidence".

The thirteen contracts for the sale of gas at the well, enumerated in one of defendant's affidavits covering more than 29,-000,000,000 feet were attacked for various reasons such as that they did not cover the period of time involved in the present suit and some were not at a fixed price but were dependent upon the price of carbon black, carried the "right to partnership in the carbon black plant" and the point of delivery was outside the Richland gas field; that others were "not made in a free market" because there "were only two markets in the field, carbon black and pipelines built into the field"; that before building into the field, the pipeline companies contracted to take all of their requirements from the defendant and other large producers, and that producers not so situated could not sell to them, and therefore there was "no open competitive market * * *", and these last-mentioned producers were forced to sell to carbon black companies or the large producers holding contracts with the pipelines. Further, that the sales alleged upon in this motion and annexed to another affidavit "were only a small, a very small part of the sales made in the Richland gas field during the period involved in this suit; that by far the largest part of the sales in the field were made to the pipelines at prices ranging from 3 to 7.6 cents per thousand cubic feet * * * so that the market price * * * at all points in the Richland gas field, including the well sued on in this case, was not less than five cents

* * * up to 1932, and six cents thereafter to the best of plaintiff's information and belief".

Further, that the opinions of most of the affiants to said affidavits "are prejudiced"; that Stokes, Hair and Hargrove are employees of the defendant; that Hunter, Feazel and Florsheim "are engaged in the gas business, doing business with defendant, and dependent on the good will of defendant for a large part of their profits and business, and C. H. McHenry is secretary of United Carbon Company, which is being sued in various suits" of the same kind as plaintiff's. Further, that the suit of Sartor v. United Gas Public Service Company, No. 61721 in the State court, copy of which is referred to and relied on by defendant as establishing a rule of state law as to admissibility and character of evidence to be considered in suits of this kind "is res inter alios acta" and that the facts before the court in that case were entirely different and the pleadings were different, hence the decision is no test of what the court would have decided had the pleadings, leases, and evidence been the same as in this case.

Plaintiff admitted that the division order had been signed, as alleged by defendant, but charged that it "was not a valid contract because it contained no consideration, was also unilateral, and was signed solely for the purpose of informing the defendant and its predecessors as to who should receive the royalty, and it was not intended by the parties, nor does the document state that it was the intention to amend or modify the lease contract."

Further, "plaintiff shows that the claim that defendant is entitled to deduct from said pipeline payments, the operating expenses of defendant in operating, gathering lines and in paying, handling and keeping valid, leases productive or unproductive, is entirely unsound and unwarranted"; that gas "can be sold only under long time contracts" providing that it should be kept under ground by the seller and delivered as called for, "and that when the parties to these leases agreed to market price royalties, they necessarily contemplated such a market of long time contracts and no sales were ever made in the field except for more or less long time contracts and the storage of gas and operating of leases are necessary expenses, which were reasonably contemplated by the parties and were not extraordinary or unexpected expenses";

and for which reasons, the pipeline sales were the ones contemplated in plaintiff's leases.

Further, that the affidavits of Stokes and Savage, purporting to show gathering costs and costs of reserves, show upon their face that many items were improperly included to pad these costs, and "plaintiff is informed and believes, and therefore avers, that said figures are grossly incorrect, but plaintiff is not able to make positive affidavit at this time because said figures are taken from private books and records of defendant, to which plaintiff has at this time no access or right of inspection, hence plaintiff has suggested that no judgment should be given on those figures but plaintiff will obtain from the court prior to the trial of this case right of inspection of said books and will then be able to show the correct figures in event the court should hold these figures to be relevant and material".

Plaintiff further denied the allegations of the motion for summary judgment that the leases did not entitle him to royalties on gasoline extracted from natural gas and averred that under decisions of the Supreme Court of the State in Coyle v. Louisiana Gas & Fuel Company, 175 La. 990, 144 So. 737, and Wall v. United Gas Public Service Company, 178 La. 908, 152 So. 561, "plaintiff is entitled to royalties of all gas produced".

As to the judgment in the case of this plaintiff and this defendant in the State court for the Parish of Caddo upon the same leases involving the gasoline extracted from natural gas, plaintiff averred that the same was decided upon an exception of no cause of action which is "a judgment in effect of non-suit permitting the plaintiff to renew the action with better allegations of fact".

With respect to the plea of prescription by the defendant of three years under Article 3538 of the Louisiana Civil Code, plaintiff averred that the "prescription was interrupted by the law suit heretofore filed in evidence herein".

### Opinion.

After nearly ten years of litigation involving many suits in this court, as well as in the State courts, the contentions of counsel with respect to these gas cases have not greatly changed, notwithstanding decisions in both jurisdictions which seem to have settled most of the questions of law.

Counsel for plaintiff has continued to insist that his clients are entitled to be paid the pipeline prices without any deductions for the elements of cost and expense in gathering and delivering the gas to the pipelines, or other considerations entering into the contracts between the producers and the pipeline companies. On the other hand, defendant still insists that these and all other market price leases, by fair construction, mean the price at the well, which it claims has never exceeded three cents per thousand cubic feet.

■■ When the question first came up in 1932, this court was of the opinion, and so ruled, that "market price" in these leases meant the fair average price at the well, if a market as a matter of fact existed at that point, but if not, then the lessor was entitled to the fair average value of the gas at the well. It was shown in every instance that the form of lease was the same as in fixed price contracts, the only difference being that in the blank space for cents, there had been written the words "market price". The State court has so held and this court is bound thereby. See Sartor v. United Gas Public Service Co., 186 La. 555, 173 So. 103. No one has ever contended that as to such fixed price leases, the quantity should be measured or the price paid on any other basis than what the meter showed at the mouth of each well. How can it be said then, that by substituting "market price" for two, three or four cents, it was intended to use a point of computation and settlement at a different place? On the other hand, if there were no sales of sufficient quantities and prices, that a reasonable man could say that a market existed at the well in the field, then the lessor was entitled to be compensated for his gas upon some basis that would give him the fair average value of the gas at the well in the field. It has been uniformly held in the latter circumstances that the usual price paid at the nearest point where a market existed, less the additional cost of taking the gas or other product to that market, is the criterion upon which the lessee or purchaser is bound to settle. This ruling is nothing but common sense and simple justice. The seller or lessor could not be said to have intended to give his property away, if a market at the well did not exist, nor could the lessee or purchaser be expected to pay more than was contemplated because of the absence of a market at the place the parties had in mind.

The plaintiffs in these suits were permitted in the beginning to introduce these pipeline contracts with the ruling of this court that in doing so they carried the duty of showing or having computed in a proper manner by experts if necessary, first the cost of gathering and transporting the gas to the point of delivery and sale to the pipelines, and secondly, the value of the other elements in those contracts such as the obligation to furnish minimum and maximum quantities, warranties, maintaining reserves, etc., which were considerations flowing to the pipeline companies for the prices which they agreed to pay. The court permitted the question of fact as to whether a market existed in the field at the well to be decided by the jury under all the circumstances. It could not, as does the State court, decide such matters as the weight and preponderance of the evidence upon the whole issues as to whether or not such market existed, but the jury was told in each case that, if they were convinced by a fair preponderance of the evidence that there was a market at the well, then within the meaning of the contract they should ignore either the prices stipulated in the pipeline contracts or the prices actually paid by the pipeline companies to the producers. The Court of Appeals for this Circuit ruled in the case of Arkansas Natural Gas Company v. Sartor in 78 F.2d 924, that the pipeline contracts or prices paid thereunder were not admissible at all, because of the conditions and stipulations therein, which did not apply in ordinary leases. However, in a subsequent case, I believe that position was modified to conform substantially to what this court had held originally—that is, in the absence of a market at the well, the pipeline prices could be used as a basis from which the cost of gathering, transporting and the value of other elements in those contracts, not appearing in ordinary leases, should be deducted to arrive at the fair value of the gas at the well. Sartor et al. v. United Gas Public Service Co., 5 Cir., 84 F.2d 436.

The reason and logic of this conclusion would seem to be supported by the following considerations:

When the production of a gas field finally gets into the hands or under the domination of one or more large producers with whom the pipeline companies make exclusive contracts, which usually happens, there is no market at the well, other than that which the producer or producers are will-

ing to pay. To that extent, the producers, from the nature of the business, acquire a position of control, more or less monopolistic, and there is absence of competition except among themselves. In the absence of State legislation requiring producers in this situation to accord equitable consideration or treatment to all landowners whether they have leased to such producers or not, it becomes possible for the producers to withdraw all the gas in a given field, sand or pool, including that under the lands of persons unable to lease or to develop and sell gas therefrom, and the latter have no recourse for gas so taken from under their property. Lessors who have leased their lands are entitled to compel production from their lands in quantities reasonably proportionate to those of other owners or lessors in the field, or in the alternative to require their lessees to respond for their failure in appropriate actions or proceedings. However, regardless of the increase or decrease in the price which the producers receive, lessors who stipulate a fixed price, are entitled to be paid and to so require payment at the rates or prices which their leases stipulate. They can not have the benefit of a higher market, nor do they have to suffer decreases of a lower market. This is not true of the market price lessor. The undoubted purpose of using that basis for payment is the hope of the lessor to have the benefit of any increase in the market, and of the lessee to pay no more than the market price if it decreases. It is certainly within the lawful discretion of the contracting parties to adopt such a basis for settlement if they so desire. However, experience has proven that the great difficulty of such a provision for sale is in ascertaining market price and the factors which should be taken into consideration in determining it.

It has been demonstrated in some of the cases which have arisen in this court from the Richland field that notwithstanding the pipeline contracts providing increased rates per thousand cubic feet over the life of such agreements, the demands at the points of large consumption or sales in large cities, such as St. Louis, Memphis and Atlanta, have been such that in order for the pipeline purchasers or carriers to survive or to meet their fixed charges, the producers, regardless of the price stipulated in the contracts, had to reduce the same to prevent insolvency of the pipeline companies, much of whose stock or other securities had been in the first instance, at least,

subscribed for or underwritten by the producers themselves. Under such circumstances, it must be conceded that the stipulated price in the pipe line contracts can form no true basis for determining the value of the gas at the well, if no market exists at that point. On the other hand, if due to consumption of greater amounts in the ultimate markets or places of consumption or from a shortage of production in the whole country or in distinct consuming areas, the prices at which the pipeline companies sell to consumers rise inordinately, the producers can not require payment for the gas in excess of the maximum figures provided in their contracts, notwithstanding the cost of production might have so increased as to wipe out all profit and to compel them to do business at a loss, unless the pipeline companies in such circumstances, as did the producers in the Richland field, saw fit to re-adjust the price structure.

In either case, that is, whether the demand in the ultimate market which consumes all or the great bulk of gas produced in any given field, increase or diminish, it seems, would necessarily have an important bearing on the price which the producers or anyone else in such fields would be willing or could pay for it at the well with or without competition. In view of these facts, can it be said that the lessor and lessee, in these market price leases, intended that they should receive or pay only on the basis of what was stipulated in a few isolated transactions in the field, when the latter were probably affected by a distressed condition brought about perhaps by the very fact that the producers had acquired such control of the field that the persons so dealing could not sell except at prices which the producers were willing to pay?

It is true that the defendant in this case, one of the largest if not the largest producer in the Richland field, in most of these cases, has shown that it stood willing and ready to pay three cents per thousand cubic feet for gas produced in the field. The same has been shown by affidavit in this case. Yet, in view of its advantageous position and the fact that no other company was shown to have made a similar proposal, what was there to prevent it from fixing two cents or four cents, except the prices at which it sold to the pipelines?

Market price, I think, means a free market, in which there are sellers and purchasers, both willing to buy and sell, and

at prices the commodity can be passed on either directly to the consumer or to the middle man at a profit; yet when the nature of that commodity is such that it can be marketed through restricted channels only, I believe that a court, in attempting to construe a contract of this kind, is justified in looking through those obstacles to ascertain and apply just and reasonable bases for the accomplishment of the purpose and intent of the parties.

I held originally and still believe that leases setting fixed prices made before the period involved in a given case, although possibly carrying some evidentiary value on the question of market price, increasing or diminishing, by their nearness or remoteness in point of time to the period in question, they are not as important as those made or sales of gas during that period, for the simple reason that the very factor which the parties had in mind might have come into play, that is, the market price may have increased or diminished.

Nothing in any of the decided cases, including the Louisiana jurisprudence, has served to weaken the views above expressed. The matter simply gets down to this: In the cases in the State court, counsel for plaintiff has been unable to recover for his clients in the Richland field because those courts pass upon the facts, including the weight of the evidence, and they have decided that the market price has never exceeded three cents. This is in line with the view of this court announced originally in the first Pardue case, but as there stated, it involves issues of fact, which in a case at law in a federal court, if there be substantial evidence both ways, must be decided by the jury.

With these thoughts in mind, we come now to the situation presented on the hearing of this motion for summary judgment. I do not believe that the plaintiff can take the arbitrary position that because of the complicated nature of the case or the difficulty of showing the existence of facts in his favor, that he will simply deny those submitted by defendant, and offer none of his own. At the same time, neither do I think that he has to submit all of his evidence. It is sufficient if he shows that he has evidence of a substantial nature, as distinguished from legal conclusions, to dispute or contradict that of the defendant on the material factual issues of the case. What have we then on the several points raised by the motion?

A mere reading of leases "B" and "C" shows that the price to be paid for gas was fixed in both "at the rate of three cents per thousand cubic feet, corrected to two pounds above atmospheric pressure" which the petiton admits has been paid, and the only issues otherwise as to these two leases are those of law; that is, first, whether plaintiff was entitled to be paid on the basis at which gas was measured in the field, that is, ten ounce pressure, instead of the two pounds which the leases stipulated; and second, whether otherwise the lessor was entitled to royalties on the gasoline extracted from the natural gas. The first of these legal questions has been repeatedly decided in favor of the defendant lessee. The parties had the right to stipulate for any pressure basis which they saw fit, and having made it "corrected to two pounds above atmospheric pressure", that is the law of the case and the basis upon which plaintiff had to be paid, regardless of how the lessee measured it when it was sold. The second point, as to whether plaintiff was entitled to royalties on gasoline, will be disposed of later in this opinion as to all three leases. Therefore, there may be eliminated from further consideration the demand for excess royalties on gas alone, as distinguished from gasoline, under lease "B" amounting to 3,145,708,000 cubic feet, as well as the 2,925,268,000 cubic feet, alleged and admitted to have been produced under lease "C".

Taking up the question of "market price" under lease "A", defendant has submitted in the affidavits and exhibits attached thereto, figures showing the sale of some 29,-000,000,000 feet of gas at the well in the field under the thirteen contracts referred to and described in Article 4 of the motion for summary judgment, as against a total of 281,000,000,000 feet purchased, produced and sold by the defendant and its predecessors in said field over the entire productive period from 1929 to 1939. Of the latter amount, it produced, in round figures, 276,-000,000,000 or 98.10 per cent and purchased 5,000,000,000 feet or 1.09 per cent. It sold 98,000,000,000 feet or 34.08 per cent under long-term pipeline contracts and 641,-000,000 feet at the well or at points on the field gathering system, the balance it transported and sold in distant markets. Thus, it appears that the quantity sold under the thirteen contracts by other persons described in Article 4 of the motion amounted to about ten per cent as much as the total

produced and purchased by the defendant, and its predecessors. Although defendant was the largest producer in Richland field, figures have not been submitted to show how much was produced by all others in the field, from which could be determined what percentage the 29,000,000,000 feet covered by the thirteen contracts bore to the whole production of the field.

Defendant has also offered some 856 leases entered into in the field over the period of its life, 799 of which or 93.04 per cent provided a royalty of one-eighth on a fixed price of three cents per thousand cubic feet, and 57 or 6.66 per cent a higher price than three cents. It has also submitted the affidavits (1) of S. D. Hunter, who held a large acreage in the field from its beginning, the major portion of which was sold some ten or twelve years ago, but who has since continued to own, produce and sell gas in the field, in which he gave it as his opinion that three cents "was the prevailing market price or value of the gas at the well in that (Richland) field"; (2) E. N. Florsheim who produced and sold comparatively small quantities of gas at the well in the field over a substantial portion of the productive period, who said that three cents was "generally considered to be the prevailing price at the well in the field"; (3) W. C. Feazel, also a comparatively small producer, stated that "in my opinion the market price or value of gas at the well in the Richland field never exceeded three cents"; and (4) C. H. McHenry, secretary of United Carbon Company, which was a large producer in the nearby Monroe field, a much more extensive and longer lived field, and who also owned individual interests in gas leases and producing properties in both fields, who swore: "In the Monroe field there was a well recognized and established price for gas of three cents per MCF delivered at the well and the prevailing market price at the well in the Richland field has never in my opinion been in excess of three cents."

These four were persons who were neither officers nor employees of the defendant, although it is true, as counsel for plaintiff asserts, that the United Carbon Company, of which McHenry is secretary, has been sued in similar cases in this court, and I believe in the State court.

Defendant also offered in evidence, the testimony of R. H. Hargrove, its vice-president, in another similar suit, Sartor v. United Gas Public Service Company, the immediate predecessor of the defendant, who, after qualifying as an expert or person familiar with prices in the Richland field, testified, under both direct and cross examination by the same counsel on both sides, that in his opinion the market price at the well in the Richland field never exceeded three cents per thousand cubic feet.

Defendant also offered in support of its motion, suits and decisions by the Supreme Court of the State, in which it has been uniformly held on the evidence produced in those cases, where the contention was essentially the same as in the present case, that there was a market price at the well in the gas fields of North Louisiana, including the Richland field, which has not at any time exceeded three cents, and that the pipeline contracts upon which plaintiff relies were not admissible as evidence to determine market price under leases of the kind involved here.

I think we may also take cognizance of the fact that in similar cases in this court, where the evidence offered by both sides was essentially the same, juries have rendered verdicts fixing the market price of gas in the Richland field, during much of the period covered by this suit, at figures of 4 cents, 4.45 cents and 4.5 cents per thousand cubic feet, and in one instance, the verdict was for the defendant (J. H. Hemler v. Hope Producing Company), the effect of which was that the jury found the three cents, which had been paid by the defendant in that case, was the market price. This, of course, as stated earlier, was made possible by the fact that the jury in each instance, decided the issue of market price differently on substantially the same facts in all cases.

■ As against the above showing by defendant, what has complainant submitted? He first raised the question of law that the motion for summary judgment disclosed no right or cause of action for summary judgment, which has already been disposed of. Rule 56 expressly permits the use of affidavits and exhibits, and it is for the court to decide whether the showing so made, as against what is offered by the opposing party, discloses a conflict as to material facts or the absence of such conflict. The Court of Appeals of this Circuit has ruled in the cases of Arkansas Natural Gas Co. v. Sartor, and Sartor v. United Gas Public Service Co., supra, that evidence of sales at the well in the field, fixed price leases and the opinions of ex-

perts or persons familiar with the prices in the field were pertinent and relevant to the question of market price.

In the first exception or answer to the motion, plaintiff averred that he lived in California during the period of production, and did not know the market price of gas in the field, but that he had filed a suit upon the same contract in 1933 in the State court of Caddo Parish for the purpose of requiring defendant to furnish this information, that this case has remained untried, and he has continued to accept statements sent him and the checks by which they were accompanied "because he did not know the exact amount due him and the said suit was an open assertion and claim that he was entitled to more"; that none of plaintiff's gas was sold at the well "but that all of it was transported to other places and there sold" at prices ranging from 5 cents to 7.06 cents per thousand cubic feet, and he then proceeded to give his version of what was meant by "market price", as including all sales in the field, among them those under the pipeline contracts without regard to the costs or expenses of transporting the gas to these lines or the other considerations in those contracts previously mentioned. This document was supported by oath alone of plaintiff's attorney, who "swore to the best of his information and belief". In the first place, plaintiff's theory of how market prices should be determined, that is, by taking these pipeline prices without deductions for the various elements above mentioned, has been repeatedly held to be wrong, both by the State courts, this court and the Court of Appeals for this Circuit. Notwithstanding, the same counsel has continued to take the position that all he has to do is to prove these prices and leave it to the defendant to show what should be deducted—in fact, he has contended and argued both to the court and juries that no such deductions should be made, and the juries who have decided in his favor have evidently accepted his view, because the prices which they fixed were not much below, if any, what the pipeline companies were paying.

■ As to the allegations that the individuals, not shown to be officers or employees of the defendant, were prejudiced, plaintiff had the right to ask for continuance to call them for cross examination for the purpose of showing such facts if they

existed, and in fact, he has in the trial of similar cases in this court, cross examined most, if not all, of them, and might have, if he had seen fit, submitted transcripts of their cross examination, just as the defendant did the examination of Hargrove. The attacks thus made upon these affidavits and upon those of defendant's officers and employees did not serve to destroy or dispute their evidence in the absence of countervailing evidence by the plaintiff. Port of Palm Beach Dist. v. Goethals, 5 Cir., 104 F.2d 706.

In the amended answer to the motion, plaintiff alleged that his counsel had conducted many lawsuits for the landowners in the Richland gas field "for more than ten years" on the subject of market price of gas and had therefore become "well acquainted with the facts regarding gas sales and the price in the field" and "all of the foregoing allegations of fact in the foregoing answer (to the motion) are true and correct". Boiled down, plaintiff's counsel says that the quantities of gas covered by the affidavits of defendant's witnesses, involved in the thirteen contracts of some 29,000,000,000 feet, were only a "small part" of the gas produced and sold; that the fixed price leases showing 93.03 per cent at three cents were not relevant to the price at the well in the field, but that sales to the pipelines constituted by far the major portion of gas produced, and that this was sufficient to meet both the showing by the defendant as to sales at the wells, fixed price leases and the proof of the costs of gathering, transporting, etc., by the defendants, which reduced the average return to defendant from the pipeline prices to less than three cents per thousand cubic feet. No effort whatever was made by plaintiff to inquire into these figures as to costs or value of the elements which have been repeatedly held should be deducted from the pipeline prices. In the trial of other cases of this same kind, which undoubtedly were dependent upon the same available evidence, plaintiff's counsel has not attempted to make proof of the value of such elements, taking the firm position that no deductions should be made therefor, and has, as stated, contented himself with cross examination of witnesses offered by defendant. This has been true in all but one case, as it is recalled, and that was Sartor v. Arkansas Natural Gas Company, supra, in which he stipulated with counsel for the de-

fendant as to costs or value of at least some of the elements, but subject, of course, to his contention that such evidence was irrelevant. It can hardly be said, therefore, that plaintiff's counsel was taken by surprise by this proof of defendant or that he did not know how to meet the situation thus presented. He simply relies on his own assertion that the figures have been padded without offering any specific facts other than this statement, which, at best, scarcely rises above the opinion or belief expressed in his affidavit to the first answer.

█ In a situation of this kind, the need is just as great to make a substantial showing as to the availability of countervailing evidence as it is in the trial itself, because the purpose of the rule is to avoid extended and useless trials to develop facts which are not really disputed. Outside of counsel's affidavit to the answer, he offers only one other, and that is, of the plaintiff himself, who simply says he knew nothing about the gas business "and knows nothing about market price in the Richland field or elsewhere". He has offered no sworn opinions by anyone familiar with prices in the Richland field, such as those tendered by defendant, except that of his counsel, who gained his opinion not by producing or dealing, but by handling lawsuits, and it is evident that this opinion is based upon pipeline contracts and prices which were disclosed at the trial of the first Pardue case and in subsequent trials.

█ In these circumstances, it does not seem to me that there is any substantial contradiction of the proof offered by defendant that there was a market price at the well in the Richland field, which did not exceed three cents per thousand cubic feet, and if not, then that the value of the gas at the well, after deducting proper expenses of transportation and the value of the other elements in the pipeline prices, was not more than three cents. Having reached this conclusion, I do not find it necessary to decide whether this court is bound by the ruling of the State courts that substantially the same evidence established a market price at the well of not more than three cents per thousand cubic feet.

█ As to royalties upon gasoline, it seems clear, from the terms of the leases themselves, that the lessee was not bound to pay anything for or to share with the lessor the proceeds or profits of the gasoline extracted from natural gas in plants at other places; and that as to casing head gas produced "from any oil well", the leases themselves fixed the amounts to be paid in the sum of $300 per year for lease "A", $50 for lease "B", and $100 for lease "C". There is no claim that any oil wells were drilled upon plaintiff's property or that any casing head gas was taken therefrom. Besides, it is shown that a final judgment was rendered in the State court for Caddo Parish upon these identical leases, from which no appeal was taken, and although rendered upon an exception of no cause of action, it was that plaintiff was not entitled to such royalties upon gasoline. This judgment necessarily required construction and interpretation of the contracts upon this subject, and I think the effect was to decide the issues for all purposes, and to bar and preclude plaintiff forever from any claim for such royalties upon gasoline whether accrued at the time of the suit or subsequently.

█ It is also my view that the pleas of prescription of three years are good against any and all demands for additional royalties upon the natural gas, which had accrued more than three years before the filing in 1933 of the suit, which is still pending in the State court; that this suit did not interrupt prescription as to royalties, which accrued after its filing, and hence prescription had likewise run upon all claims from the time of that suit until the present one was filed, save as to the three years immediately preceding the date of filing the last one in this court.

The defenses of estoppel, accord and satisfaction have already been decided adversely to defendant, and affirmed by the Court of Appeals for this Circuit upon substantially the same facts in the case of Union Producing Co. v. Pardue, 117 F.2d 225.

For the reasons above stated, the motion for summary judgment should be granted.

Proper decree should be presented.