THE MONTANA POWER COMPANY, PLAINTIFF AND RESPOND-
ENT *v.* GAY L. KRAVIK, DEFENDANT AND APPELLANT.

No. 13966.
Submitted Sept. 12, 1978.
Decided Nov. 3, 1978.

Aronow, Anderson, Beatty & Lee, Shelby, for defendant and appellant.

Jardine, Stephenson, Blewett & Weaver, Great Falls, John D. Stephenson (argued), Great Falls, for plaintiff and respondent.

MR. JUSTICE DALY delivered the opinion of the Court.

The Montana Power Company, respondent, initiated this action in the District Court, Hill County, for a declaratory judgment to determine the "market price" under which it is required to pay royalties to Gay Kravik, appellant, pursuant to an oil and gas lease. The case was submitted to District Court on the pleadings, answers to interrogatories, and a stipulated set of facts. The case was argued orally and deemed submitted March 3, 1977. The court issued its findings, conclusions and order May 11, 1977. Kravik appeals.

The facts underlying this action are:

In 1967 Kravik, owner of certain lands in Hill County, entered into an oil and gas lease with the Montana Power Company (Montana Power) by which Montana Power agreed to pay royalties in

the amount of "one-eighth (1/8) of the market price of the gas in its natural state at the well." This provision is referred to in a subsequent gas pooling agreement which does not materially alter the lease in this respect.

In 1969 Montana Power completed a well, designated as the Kravik # 6-29 well, on land included in the lease. At all times since then this well has produced natural gas in commercial quantities. Because Montana Power is the lessee, producer, purchaser and distributor for all gas taken from this well, the full agreement between the parties relating to the price to be paid is found in the lease. The gas is not and has not been sold into interstate commerce.

Montana Power has paid royalties under this lease over the years beginning at $.10/mcf (thousand cubic feet) and increasing to $.40/mcf, the price at the start of this action. This last rate has been paid since July 1, 1974. Prior to this action, in March, 1976, Kravik demanded royalties with reference to a higher market price.

The parties agree that market prices fluctuate depending to some extent on prices being paid in the same general area under similar conditions and the period of time in which the gas is produced. The major disagreement between the parties is the weight to be given to the various facts and circumstances in determining market price.

The District Court concluded the relevant rate for this particular well should be set at $.85/mcf, based on the reasoning that the nearest competitor for Kravik's gas, the Northern Mutual Gas Company, which is regulated by the Federal Power Commission (FPC), would be able under FPC regulations to pay $.80/mcf. Montana Power, which is not regulated by the FPC, would therefore be expected to pay a little more than that to meet the competition.

More specifically, the regulations entering into the District Court's determination deal with FPC mandated price ceilings on the price of gas as determined by the "vintage" of the gas—that is, the year in which the well was drilled. Under these regulations, gas from a well drilled in 1969 is sold for less than gas from a well drilled after 1975 (the old gas/new gas differential).

Although phrased differently by the parties, the issue for this Court to resolve is:

Of what relevance are FPC regulations governing the interstate sale of gas to the determination of the "market price" of gas sold only intrastate?

A secondary issue also addressed is the desirability of establishing a flat rate of $.85mcf for Kravik's gas "until further order of the court" in view of the market price fluctuations recognized by the parties and of the interest in terminating litigation.

Our analysis necessarily begins with a discussion of the extent of regulation by the federal government of sales of natural gas. The Natural Gas Act, 15 U.S.C. Chapter 15B, deals with federal regulation of sales of natural gas, vesting the Federal Power Commission with regulatory authority. Pursuant to this authority, the FPC has promulgated related regulations to control the price of natural gas sold in interstate commerce. 18 C.F.R. § 2.56(a), (b). Under these regulations, gas from a well drilled after 1975 may be sold at $1.42/mcf; from a well drilled between 1973 and 1975 for $.93/mcf; and from a well drilled before 1973 for $.52/mcf if pursuant to a post-1973 interstate sale contract, 18 C.F.R. § 2.56(a), and for $.23/mcf if pursuant to a pre-1973 contract, 18 C.F.R. § 2.56(b). These prices are subject to further adjustment for type and quality of gas.

The question of the relevance of these FPC price ceiling regulations to royalties paid to landowner-lessors has been resolved in a series of cases beginning with two Fifth Circuit decisions. *Weymouth v. Colorado Interstate Gas Co.* (5th Cir. 1966), 367 F.2d 84; *J. M. Juber Corp. v. Denman* (5th Cir. 1966), 367 F.2d 104. In these cases, the "transcendent public interest" issue of the jurisdiction of the FPC over rates to be paid for gas royalty was referred to the FPC. The FPC, in a 3-2 vote, held that "the royalty provisions of oil and gas leases constitute sales of natural gas for resale in interstate commerce subject to all the provisions of the Natural Gas Act." R. 5045; 42 FPC at 174. The District of Columbia Circuit Court promptly reversed the FPC's assumption of jurisdiction over

royalty payments. *Mobile Oil Corp. v. FPC* (1972), 149 U.S.App.
D.C. 310, 317, 463 F.2d 256, 263, cert. den., 406 U.S. 976, 92
S.Ct. 2409, 32 L.Ed.2d 676. This decision applied to lessors of gas
producing lands whose lessees were interstate as well as intrastate
sellers; the lease arrangement in either case was simply not viewed
as a sale in interstate commerce:

"When we come to an ordinary lease by the landowner to the
producer there is neither a 'customary' sale in interstate commerce
nor its equivalent in economic offset. Such a lease is a transaction
that is itself customary and conventional, but one that precedes the
"conventional' sales in interstate commerce with which Congress
was concerned, indeed even precedes the 'production and gather-
ing' which § 1(b) visualized as preceding the sale in interstate com-
merce over which jurisdiction was being established." 463 F.2d at
262.

Further, as stated in *Lightcap v. Mobil Oil Corp.* (1977), 221
Kan. 448, 562 P.2d 1, 8, cert. den., 434 U.S. 876, 98 S.Ct 228, 54
L.Ed.2d 156, to limit royalty payments to the FPC ceiling price is
to analyze the problem backward:

". . . [T]he process begins at the other end. The royalties to be
paid are first to be determined under state law, based on the terms
of the lease. The royalties so determined then become a component
cost, to be considered by the FPC in determining the rates it will
permit Mobil to charge."

If, as subsequent events develop, the producers are put in a bind
by their royalty obligations, they may petition the FPC for in-
dividual relief. *Mobil Oil Corp. v. FPC* (1974), 417 U.S. 283, 328,
94 S.Ct. 2328, 2355, 41 L.Ed.2d 72, 106 aff'g., *Placid Oil Co. v.
FPC* (5th Cir. 1973), 483 F.2d 880, 911.

■ The impact of these decisions is that the FPC price regula-
tions are of no relevance in setting the amount of royalty to be paid
under a market price lease. *Mobil Oil Corp. v. FPC*, 463 F.2d at
264; *J. M. Huber Corp. v. Denman*, 367 F.2d at 109. The existence
of federal regulation over the rates which a gas producer may
receive is no obstacle to the fixing of a higher rate as the market

value of the gas it sells for the purpose of computing royalties. *Lightcap v. Mobil Oil Corp.*, 562 P.2d at 8. The possibility that a royalty base might in fact exceed the FPC ceiling has been clearly recognized. *Mobil Oil Corp. v. FPC*, 417 U.S. at 328, 94 S.Ct. at 2355, 41 L.Ed.2d at 106; *Lightcap*, 562 P.2d at 7. Neither does the collection of royalties at a rate in excess of that established by the FPC subvert the purpose of the Natural Gas Act nor under cut the federal regulatory system *Mobil Oil Corp. v. FPC* 463 F.2d at 265; *Kingery v. Continental Oil Co.* (W.D.Tex.1977), 434 F.Supp. 349, 355.

The above cases deal with lessors whose lessees sell the gas in interstate commerce, so that the prices for which the lessees can in turn sell the gas are regulated by the FPC. 15 U.S.C. § 717c; *Lightcap*, 562 P.2d at 7. Despite this nexus between lessee and FPC regulation, the lessor is not bound to accept the FPC regulated price as the market price. In the instant case, where neither lessee nor lessor has any connection with interstate commerce or the FPC, the relevance or applicability of the FPC regulated price is nonexistent.

The District Court concluded that an FPC regulated competitor of Montana Power would pay, according to the FPC price regulations, only $.80/mcf to beat the competition. This conclusion is erroneous in its premise. Under the type of market price lease here, even an FPC regulated gas company would have to pay royalties based on actual market price of gas, regardless of FPC regulations. *Mobil Oil Corp. v. FPC*, 463 F.2d at 263, 149 U.S.App.D.C. at 317; *J. M. Huber Corp. v. Denman*, 367 F.2d at 109-10; *Kingery v. Continental Oil Co.*, 434 F.Supp. at 354-55; *Lightcap*, 562 P.2d at 11. Clearly, a non-FPC regulated company and lessor are not to be bound by these regulations. Cf. *Butler v. Exxon Corp.* (Tex.Civ.App.1977), 559 S.W.2d 410, 412 ("price of natural gas in the intrastate market in Texas rapidly escalated . . . to over $2.00 per mcf by early 1975") with 18 C.F.R. § 2.56(a) (establishing price ceilings of $1.42mcf for wells drilled after 1975 and $.93/mcf for wells drilled between 1973 and 1975).

In *Kingery*, where the lessor leased to an *interstate* dealer under a market price lease, the court looked not to the FPC regulations or to other interstate sales, but to evidence of *intrastate* sales to determine market price:

"*The market value* at the well of the gas produced from the Goodwin Lease *is established by evidence of specific intrastate sales of gas* and contract negotiations for intrastate sale of gas in the immediate vicinity of the Goodwin Lease during the period from 1972 through the present." 434 F.Supp. at 351. (Emphasis added.)

If the reasoning used by the District Court here had ever been applicable, the situation in *Kingery* would have evoked it. Its rejection there necessitates a rejection here.

The same result was also reached prior to the above series of cases in *Phillips Petroleum v. Bynum* (5th Cir. 1946), 155 F.2d 196, 198-99, on the basis of noncomparability of interstate and intrastate sales of gas. Nothing, *inter alia*, that interstate "pipe line companies are subject to rate-fixing by governmental agencies", the Court in *Bynum* stated:

"These, and other, considerations make sales to such pipe lines noncomparable, irrelevant, and incompetent in an endeavor to ascertain either market or actual value of gas . . ." 155 F.2d at 199.

See also *Weymouth v. Colorado Interstate Gas Co.* (5th Cir. 1966), 367 F.2d 84, 89-90, for a discussion of the tight regulation of the interstate gas market where in the court concluded: "It is in no sense a 'free' market."

With rejection of the District Court's method for determining the market price of lessor's gas, it becomes necessary to provide the District Court with direction on remand for making this determination. This requires an analysis of the term "market price".

*Black's Law Dictionary* (4th Ed., 1968), 1122, defines "market price" as:

"The price actually given in current market dealings, and actual price at which given commodity is currently sold, or has recently been sold in open market, that is, not at forced sale, but in the usual

and ordinary course of trade and competition between sellers and buyers equally free to bargain, as established by records of late sales."

Accord, *J. M. Huber Corp. v. Denman*, supra; *Johnson v. Jernigan* (Okl.1970), 475 P.2d 396, 398; *Shamrock Oil Co. v. Coffee* (5th Cir. 1944), 140 F.2d 409, 410.

■ Where there is no stipulation to the contrary in a lease of this kind, market price is understood to mean the *current* market price being paid for gas at the well where it is produced. *Sartor v. United Gas Public Service Co.* (1937), 186 La. 555, 173 So. 103, 105. Thus, market price is determined at the time the gas is produced. *Voyta v. Clonts* (1958), 134 Mont. 156, 164 328 P.2d 655, 660. Accord, Kingery, 434 F.Supp. at 354; *Texas Oil & Gas Corp. v. Vela* (Tex.1968), 429 S.W.2d 866, 871; *Hemler v. Union Producing Co.* (W.D.La.1941), 40 F.Supp. 824, 834; *Wall v. United Gas Public Service Co.* (1934), 178 La. 908, 152 So. 561, 563. The price to be paid is not to be an arbitrary price fixed by the lessee but the price actually given in current market dealings. *Swain v. Santa Fe Pacific Railroad Co.* (1975), 24 Ariz.App. 349, 538 P.2d 1150, 1152; *Hemler*, 40 F.Sup. at 832-33; *Wall*, 152 So. at 563.

On the other hand, if, because of an absence of comparable sales, a reasonable person would say that no market existed at the well in the field, then the lessor *is* entitled to be compensated for his gas upon some basis that would give him or her the fair value of the gas at the well. *Hemler*, 40 F.Supp. at 832, *Johnson v. Jernigan*, supra, 475 P.2d at 398.

By adopting this approach, effect would be given to the desires of both parties in using "market price" to determine royalties, that lessor should receive no less and lessee pay no more than the current selling price of the gas. *J. M. Huber Corp.*, 367 F.2d at 110; *Hemler*, 40 F.Supp. at 832.

As noted above, the federal district court in *Kingery* looked to *lease of intrastate sales* of gas to establish the market price of the lessor's gas. In this case, reference is made in the record to some 90 contracts Montana Power has entered into to meet their intrastate

gas needs. With the reminder that the term "market price" implies current market price, this case is remanded for the taking of evidence on the question of what the lessee is currently paying under its intrastate gas leases. Further, to avoid lessee arbitrarily establishing a price on its own, the District Court should look at evidence of what other buyers of natural gas in the intrastate market are paying.

The criteria of comparability of these other intrastate leases are that they be comparable to lessor's well in quantity, quality, and availability to marketing. County boundaries are not a factor in making proof of the market price of lessor's gas. *Vela*, 429 S.W.2d at 873; *Bynum*, 155 F.2d at 198, 201. The question is not what lessee's nearest competitors are paying in Hill County but what is being paid in recent, substantial, and comparable sales of similar gas whose availability to marketing is reasonably similar to lessor's gas. *Hugoton Production Co. v. United States* (1965), 349 F.2d 418, 430, 172 Ct.Cl. 444; *Shamrock Oil & Gas Corp. v. Coffee*; supra; *Bynum*, supra.

The United States Court of Claims lists seven specific factors that influence the price a seller of natural gas can demand for his product:

"(a) The volume available for sale. Generally the greater the volume or reserves, the greater the price the seller could command.

"(b) The location of the leases or acreage involved, whether in a solid block or scattered, and their proximity to prospective buyers' pipelines.

"(c) Quality of the gas as to freedom from hydrogen sulphide in excess of 1 grain per 100 cubic feet.

"(d) Delivery point.

"(e) Heating value of the gas.

"(f) Delivery of the wells. The larger the volume that could be delivered from a reserve, the greater the price the seller could command.

"(g) Delivery or rock pressure. The higher the pressure, the less

compression for transportation is required." *Hugoton Production Co. v. United States* (1963), 315 F.2d 868, 894-95, 172 Ct.Cl. 444.

These are the type of factors which should be considered for purposes of arriving at a comparable sale of gas and thus a comparable market price. Se also *Vela*, 429 S.W.2d at 872. Implicit in this approach is a rejection of any mathematical averaging of *all* prices paid in the field as determinative of a final market price. *Vela*, at 873. But see *Hugoton Production Co. v. United States* (1965), 349 F.2d 418, 172 Ct.Cl. 444.

■ Should neither of these types of leases—Montana Power Company intrastate or other buyer intrastate—satisfactorily determine market price, an alternative test may be utilized: Where no market exists in the field, in the absence of unlawful combination or suppression of price, royalty may be computed upon receipt from the marketing outlet for the products, less the costs and expenses of marketing and transportation. *Bynum*, 155 F.2d at 198; *Johnson*, 475 P.2d at 398; Hemingway, *The Law of Oil and Gas* (1971), § 7.4. This is the least desirable method for determining market price and should be used only if the lease comparison method described above is not suitable.

■ As to the extent of its holding, the District Court in its order established a rate of $.85/mcf "until further order of this Court." This amounts to a rewriting of the lease between the parties substituting ".85/mcf" for "market price" until one of the parties comes back into court for a readjustment of this rate. On remand, the final order should be modified to allow for nonjudicial future agreements between the parties as to market price. See e. g., *Kingery*, 434 F.Supp. at 356; *Vela*, 429 S.W.2d at 869. If an agreement cannot be reached, the parties are always free to come back into court for a judicial determination. To require constant relitigation to redetermine "market price" is contrary to the judicial interests of terminating current litigation and preventing repetitious, continuous future litigation.

The order of the District Court is reversed and the cause remanded for further proceedings consistent with this opinion.

MR. CHIEF JUSTICE HASWELL and JUSTICES SHEA, HAR-RISON and SHEEHY concur.